285 N.J. Super. 623 (1995)
667 A.2d 1111
PEDRO CALDERON, PLAINTIFF-APPELLANT,
v.
MACHINENFABRIEK BOLLEGRAAF APPINGEDAM BV; VAN DYK[1] BALER CORPORATION, DISTRIBUTOR, DEFENDANTS-RESPONDENTS, AND ABC COMPANY (NAME UNKNOWN AND THEREBY FICTITIOUS), MANUFACTURER AND/OR DISTRIBUTOR OF BALING MACHINE; XYZ COMPANY (NAME UNKNOWN AND THEREBY FICTITIOUS), INSTALLER; EFG MAINTENANCE COMPANY (NAME UNKNOWN AND THEREBY FICTITIOUS); AND ALPHA PAPER RECYCLING COMPANY, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Submitted November 21, 1995.
Decided December 14, 1995.
*625 Before Judges DREIER, KESTIN and CUFF.
Robert M. Schlanger, attorney for appellant (Mr. Schlanger, of counsel and on the brief).
Daniel K. Newman, attorney for respondents (Mr. Newman, of counsel and on the brief).
The opinion of the court was delivered by DREIER, P.J.A.D.
Plaintiff appeals from a judgment dismissing his complaint following a jury verdict.
As an assistant manager for Alpha Paper Recycling Company in Jersey City, plaintiff was responsible for the operation of a sizeable baling and compacting machine manufactured and distributed by defendants. Plaintiff's arm was amputated when he reached into the machine to untangle some wire. He assumed that he could withdraw his arm before four large steel rods would be activated and move through the area. Following defendants' motion for an involuntary dismissal, the trial judge dismissed both plaintiff's allegations of a design defect and plaintiff's claims based upon service visits by the distributor. The case was submitted to the jury solely on the issue of a warning defect. The jury *626 determined by a five to one vote that the warnings were inadequate, but further decided by unanimous vote that the inadequate warnings had not been a proximate cause of plaintiff's injuries.
The baling machine had been sold to Alpha Paper Recycling Company in 1986 by the manufacturer's distributor, defendant Van Dyk Baler Corporation. The employer was supplied with an operations manual that contained a section on safety. The machine, manufactured in the Netherlands by defendant Machinenfabriek Bollegraaf Appingedam BV (Bollegraaf), was twenty-two feet high, forty feet long and eight feet wide. Paper was fed into the machine by a conveyor eighty feet long and eight feet wide. The machine and conveyor were placed over two pits, one for the conveyor and a smaller one, three feet by six feet, for the needle area. The "needles" were actually four heavy steel rods, each having a circumference of two and one-half inches. The needles were placed ten inches apart and rode up and down.
When the distributor was called in from time-to-time to service the machine, the servicing personnel worked from the top of the machine or in the pits. There were, however, two small access doors on either side of the machine that provided a line of sight into the needle area. The photographs show these doors approximately two feet above the base of the machine, and testimony indicated that each door was approximately four inches high and ten inches wide. A "Caution" sign was located approximately a foot and a half below each door.[2] When one examined the machine from the top or the side, the view of the access doors was obstructed by other parts of the machine. At the time the machine was manufactured and delivered, the access doors were covered by a heavy metal grate with an interlock that shut down the needle assembly whenever the grate was lifted.
*627 The machine received heavy use, and the wires in the needle assembly regularly became tangled. Alpha's management removed the safety grates on the access doors approximately two years before this accident. Since there was an interlock shut-off on the metal grates, Alpha did not merely remove the grates, because this would have activated the interlock and prevented operation of the machine. Using blow torches, grinders, and precision instruments, Alpha cut away all of the grate except the small portion that triggered the interlock. A small strip of metal remained in contact with the bottom of the access door, thus effectively nullifying the manufacturer's safety device. Employees could then reach into the machine and straighten the wires without having the machine automatically shut down.
Van Dyk and Alpha had no maintenance contract. A maintenance and servicing agreement had been offered to Alpha whereby Van Dyk's employees would have regularly inspected the machine, including an inspection for safety defects, but it was expressly refused by the employer. Van Dyk therefore serviced the machine on an on-call and as-needed basis. Since the purchase of the machine, Van Dyk's employees had worked on its various parts on more than twenty occasions, but there was no direct evidence that a Van Dyk employee had ever seen the condition of the access door on any of these service calls. Plaintiff's expert, however, found it incredible that someone who had worked on the top of the machine or down in the pit beneath the machine would not have seen the missing safety grate.
At the time of the January 8, 1990 accident, plaintiff was working on the machine. The plant manager and shift foreman had previously shown plaintiff how to untangle the wires in the machine. Plaintiff measured his safety margin for reaching into the machine by reference to a digital counter or "clock" which depicted the length of the paper being baled at the time. Each number on the clock represented approximately five inches of paper moving through the machine. From his experience, he could put his hand in the machine when the meter registered five *628 and have sufficient time to untangle the wires before the meter registered thirteen (approximately equivalent to a forty-inch bale), at which time the needles would rapidly descend. On the day of the accident and about fifteen minutes before the end of his twelve-hour shift, plaintiff's past experience with the clock failed to protect him, and his hand and arm were pinned by the machine.
Plaintiff most probably was aware that the needle area was not designed to be serviced while the machine was running. On occasion plaintiff had started the machine from the control panel which bore a sign reading "DANGER. HIGH VOLTAGE. Turn switch handle to off position and padlock before performing any maintenance." But Alpha was portrayed at the trial as a poor employer,[3] and even defense experts admitted that plaintiff probably would have been fired for refusing to service the machine while it was still running. In 1993, plaintiff was laid off by Alpha and remained unemployed at the time of the April 1994 trial.
Plaintiff has not challenged the dismissal of the design defect claims against the manufacturer, but asserts that the manufacturer's warnings were inadequate. He further claims that Van Dyk, as the servicing distributor, had an independent duty to warn Alpha concerning the dangers of the missing safety grate. Plaintiff's expert had testified that Van Dyk's "failure to communicate the danger associated with the machine" as well as the inadequacies of the warnings were proximate causes of plaintiff's injury.
The trial judge determined, however, that in view of the relationship between Van Dyk and Alpha, which called for no safety inspections, and Alpha's specific rejection of a general servicing and inspection agreement, Van Dyk had no responsibility to perform more than the specific services which were ordered periodically. Peter Van Dyk had worked on the machine in the past and on at least one occasion had seen a specific safety problem, and had informed plaintiff's employer. On that occasion *629 he sent Alpha a certified letter decrying a dangerous practice with the conveyor which he had observed during a service call.[4] There was no showing, however, that Alpha either considered Van Dyk's service calls to be safety inspections or even desired such inspections. In fact, Alpha's active effort to thwart the safety device on the grates belies any thought that Van Dyk's reiteration of the purpose of the safety grate would have changed Alpha's practices. Its actions are compelling evidence to the contrary. Taking these facts into consideration, the judge ruled as a matter of law that there was no duty owed by the servicer to the employees.
The court recognized that this case was governed by the 1987 Products Liability Act, N.J.S.A. 2A:58C-1 et seq., and that the substantial changes to the access grates protected the manufacturer from a design defect claim under Brown v. United States Stove Co., 98 N.J. 155, 167, 484 A.2d 1234 (1984), and McDermott v. TENDUN Constr., 211 N.J. Super. 196, 210, 511 A.2d 690 (App. Div.), certif. denied, 107 N.J. 43, 526 A.2d 134 (1986). The judge supported his dismissal of the failure to warn claims against Van Dyk as a servicing company by reference to Seeley v. Cincinnati Shaper Co., Ltd., 256 N.J. Super. 1, 606 A.2d 378 (App.Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992). He explained the deficiencies in plaintiff's proofs:
There is, for example, no evidence that the service people actually saw the machine in operation; no evidence that they were trained as safety experts; no evidence that they were present at Alpha as safety inspectors; no evidence that they were viewed by Alpha as safety inspectors; no evidence, indeed evidence to the contrary based on the repetition of the conveyor belt incident after there had been warnings given by Van Dyk, both at the time of the visit and by subsequent letter, that Alpha relied upon their analysis in terms of their continuing their operation in any way; and no evidence that they assumed such responsibility for insuring the safety of the operation of the machine.
As noted earlier, the court determined that the facts made out a prima facie case solely for a warning defect and submitted that one issue to the jury.
*630 Plaintiff first argues that Van Dyk had a duty to warn of dangers of which it became aware during post-sale service calls, and therefore, Van Dyk's motion to dismiss at the close of the plaintiff's case should not have been granted. Plaintiff contends that Van Dyk or its personnel must have been aware of the alteration of the machine. Some of the twenty to twenty-five service visits involved repairs or replacement of the "needles" themselves, necessarily placing servicing personnel within five feet of the missing safety grates. In his testimony, Peter Van Dyk did not minimize the services he intended to render when called to service a machine. He stated that there was a policy for all service employees who work on machines:
[A]s soon as they notice something dangerous on the machine, like a door being cut off or something like that, they have to correct the problem, if possible; and they have to immediately notify us. And we immediately send out, same day, a certified letter to that particular client that that happened at.
He further stated that if he had known the doors were missing, "we would have  well as I said, immediately sent a certified letter and try to correct the problem. We would have probably also called the client...." Plaintiff contends that these facts as well as plaintiff's expert's testimony provided the foundation for submission of this issue to the jury.
In great detail, plaintiff has distinguished Van Dyk's activities from those of the manufacturer's representative in Seeley v. Cincinnati Shaper, supra. We noted in Seeley that the representative had not been a safety inspector, but had merely been paying a courtesy call as a result of the employer's request for information. While at the plant, the representative had given the employer additional safety information, but had not inspected the machine in any way, other than to notice that there had been substantial alterations. Id. at 11-17, 606 A.2d 378. We noted that the representative's visit to the plant would have entailed responsibility for the manufacturer only if he "had the duty to inspect the press brake for safety defects and warn [the employer] concerning them[;] then [the manufacturer] can be responsible for the breach *631 of such a duty" because neither inspection nor warning issued from the visit. 256 N.J. Super. at 17, 606 A.2d 378.
Likewise in Lally v. Printing Machinery Sales & Serv. Co., 240 N.J. Super. 181, 187, 572 A.2d 1187 (App.Div. 1990), we emphasized the distinction between the duties of those who manufacture or rebuild a machine and those who only maintain or repair them. Id. at 184, 572 A.2d 1187. We stated:
[W]here a claim is made against other than a manufacturer or rebuilder, even though there may be some duty to inspect the machine, no liability is imposed for the failure to provide a safety device or warn the user.... In such a case liability may be imposed only if the service itself is negligently performed, the parts provided are themselves defective, or another basis for liability exists.... It would be highly unfair if an auto mechanic who changes a flat tire, thus enabling an incapacitated automobile to be used, becomes responsible for warning of the lack of all safety devices relating to the wheel on which he was working, or even to the car as a whole.
[Id. at 186-187, 572 A.2d 1187 (citations omitted).]
Given this precedent, Van Dyk could be liable under a warning theory only if it had assumed some special duty towards the employer. In Seeley, there had been no "showing that [the employer] viewed [the representative] as a safety inspector and relied upon his analysis in continuing to fail to provide safety devices; nor that [the representative] assumed such responsibility by any act or deed." Id. at 18-19, 606 A.2d 378. In our case, however, there was the evidence just summarized that Van Dyk assumed some safety role. It appears that Peter Van Dyk recognized a broader duty to advise Alpha than his company was contractually bound to perform. There also is some slight evidence that Alpha viewed Van Dyk as a safety inspector, namely the one occasion when Alpha took Van Dyk's advice, and placed a safety cable over the conveyor. But these actions certainly did not thereafter make Van Dyk the insurer of the employees' safety when using the machine. At the very most, Van Dyk could possibly be found to have obligated itself to notify Alpha of problems that Van Dyk or its employees recognized or should have recognized. The judge nevertheless determined that Van Dyk could not be liable based on its service visits. A jury, *632 however, might have found that Van Dyk had assumed an obligation to warn Alpha. The dismissal of the claim against Van Dyk Baler Corporation on the basis of a lack of duty to warn was therefore error.
The breach of this duty to warn, however, was too slim a reed on which to base liability against Van Dyk and, therefore the error was harmless. Even if the jury assumed that Peter Van Dyk or an employee noticed or should have noticed that the safety grates had been cut away, the jury was not required also to assume that Alpha would have heeded the warning.
There is no question that there is a heeding presumption in effect in New Jersey. Coffman v. Keene Corp., 133 N.J. 581, 603, 628 A.2d 710 (1993). Absent contrary evidence, there would have been a presumption that Alpha would have followed Van Dyk's warnings, had they been given. In this case, however, we have the evidence that the original interlocked grates which would have shut down the machine were painstakingly removed by Alpha so that the machine could be kept running during servicing. Further, all parties acknowledged that plaintiff's employer required him to untangle the wires while the machine was running. The undisputed facts of this case strongly rebut the presumed fact, thus abrogating the presumption. N.J.R.E. 301.
If a presumption is rebutted, N.J.R.E. 301 requires that the jury still be permitted to decide the issue.
If evidence is introduced tending to disprove the presumed fact, the issue shall be submitted to the trier of fact for determination unless the evidence is such that reasonable persons would not differ as to the existence or nonexistence of the presumed fact. If no evidence tending to disprove the presumed fact is presented, the presumed fact shall be deemed established if the basic fact is found or otherwise established. The burden of persuasion as to the proof or disproof of the presumed fact does not shift to the party against whom the presumption is directed unless otherwise required by law. Nothing in this rule shall preclude the judge from commenting on inferences that may be drawn from the evidence.
[Emphasis added.]
The Supreme Court Committee Comment further explains:

*633 The principle is that a valid presumption can be used to establish a prima facie case, but the presumption normally disappears in the face of conflicting evidence. Nevertheless, any logical inference which can be drawn from the basic fact remains. Thus, the rule provides that the trial judge is not precluded from commenting on inferences that may be drawn from the evidence, even when conflicting evidence is presented. Note also that under Rule 301 the burden of persuasion is not shifted to a party against whom the presumption operates.
While generally the natural inferences underlying a presumption will warrant giving the issue to the jury, with appropriate comments by the court, N.J.R.E. 301 recognizes that there are exceptional cases. Where "reasonable persons would not differ as to the existence of the presumed fact," the issue need not be presented to the jury. N.J.R.E. 301.
We do not believe that a reasonable jury in this case could have determined that even a certified letter from Van Dyk explaining that the grates should be reinstalled would have been followed by Alpha. See Coffman v. Keene Corp., supra, 133 N.J. at 607-608, 628 A.2d 710.
[I]n a given case, the defendant may be able to establish that the employer's conduct, not the failure to warn, was the cause in fact of the injuries attributable to the harmful product. An employer's conduct, in ... intentionally preventing employees from heeding a warning, may be a subsequent supervening cause of an employee's injury that will serve to break the chain of causation between manufacturer and employee. See Brown v. United States Stove, 98 N.J. 155, 171-75, 484 A.2d 1234 (1984). Thus, if an employer's subsequent course of misconduct is an independent cause of an employee's injury, the absence of a warning itself may have too remote a causal connection to the injury. Id. at 174, 484 A.2d 1234.
[Id. at 608, 628 A.2d 710.]
This jury clearly rejected a similar conclusion when it found the failure to warn not to be a proximate cause of the accident.
We articulate this conclusion because we acknowledge that there is some evidence in this case which, building inference upon inference upon inference, could engender responsibility by Van Dyk. Such a conclusion would first require a jury to determine that the single incident years before caused Alpha to rely upon Van Dyk's safety suggestions, even though the employer had turned down inspection agreements and Van Dyk had never inspected the machine for safety. A jury then would have to find that although there was no direct evidence that Van Dyk or any of *634 his employees had ever noticed the missing grates, one of them actually did see, or should have seen them, and recognized the danger (as opposed to assuming that the grate was open rather than removed). This is as far as the jury could have accepted plaintiff's theory based upon the proofs. For plaintiff to prevail the jury would then have to have applied the heeding presumption or its underlying inference and determined that Alpha would have abandoned its long-standing policy of requiring employees to service the machine while running. If it followed Van Dyk's suggestion, had it been made, Alpha would have had to authorize the workers to stop production each time the wires had to be untangled. Only if a jury continued this chain of inferences, in the face of strong and unrebutted evidence to the contrary, could liability have been imposed upon Van Dyk.
To reverse on such a factual issue would fly in the face of the policy of the Supreme Court expressed in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995), applicable to summary judgment motions. If the transactional costs of litigation are to be held in check, such attenuated theories of liability should not force parties to continue litigation that is over in all reasonable respects. Brill refocused the summary judgment procedure towards that employed for directed verdicts under R. 4:37-2(b) which permits a weighing of evidence to determine if a genuine issue of material fact exists. Id. at 535-540, 666 A.2d 146. Justice Coleman, citing to the federal standards for summary judgment, noted:
Of course, there is in this process a kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials. This process, however, is not the same kind of weighing that a factfinder (judge or jury) engages in when assessing the preponderance or credibility of evidence. On a motion for summary judgment the court must grant all the favorable inferences to the non-movant. But the ultimate factfinder may pick and choose inferences from the evidence to the extent that "a miscarriage of justice under the law" is not created. R. 4:49-1(a).
[Id. at 536, 666 A.2d 146.]
When we view the record before us in light of the standards of Brill, it is clear that there was no genuine issue of material fact concerning Van Dyk's liability.
*635 We further note that the warning defect claim against the manufacturer was properly given to the jury. Again, the heeding presumption was not charged, as it should have been, with respect to the manufacturer's warnings provided to Alpha's employees. Yet as noted earlier, it would also be difficult to say on these facts that plaintiff should have been presumed to have heeded the warnings, had the manufacturer given them. This proposition, much the same as the presumption that the employer would have heeded Van Dyk's warnings, is rebutted by the facts of the case. Plaintiff knew that his job was dependent upon servicing the machine while it was running. The access area could have been covered with warnings, but it is clear that plaintiff would still have attempted to untangle the wires. After hearing all the facts, the jury determined specifically that the lack of warnings was not a proximate cause of plaintiff's injury. "It is unreasonable to assume that an employee would leave his or her position once apprised of certain safety hazards when such hazards are not rectified by the employer." Coffman v. Keene Corp., supra, 133 N.J. at 605, 628 A.2d 710. "Evidence that a plaintiff would have disregarded an adequate warning would tend to demonstrate that the plaintiff's conduct, rather than the absence of a warning, was the cause in fact of the resultant injury." Id. at 604, 628 A.2d 710. We see only harmless error here. R. 2:10-2.
Furthermore, plaintiff's own testimony also provided sufficient facts to show that he knew of the danger of the descending needles and that he relied upon the "clock." There is no showing that the manufacturer knew that the users of the machine relied upon the clock, especially since the manufacturer had provided interlocked grates to prevent an injury of this type from happening. Notwithstanding the thousands of times that the clock had been accurate, on this occasion either plaintiff misread the numbers, the machine malfunctioned, or the relationship of the activation of the needles and the numbers of the clock was not based upon proper principles. There is no evidence concerning this issue, and we cannot presume a warning defect caused the injury. As plaintiff appreciated the dangers of the descending needles at *636 the very moment he inserted his arm, the inadequate warnings could not have been a proximate cause of his injury. Fabian v. Minster Machine Co., 258 N.J. Super. 261, 280, 609 A.2d 487 (App.Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992); Vallillo v. Muskin Corp., 212 N.J. Super. 155, 159-160, 514 A.2d 528 (App.Div. 1986), certif. denied, 111 N.J. 624, 546 A.2d 540 (1988).
Although plaintiff also contends that the trial judge's instructions concerning the adequacy of warnings was erroneous, we need not analyze this issue. Since plaintiff prevailed on this point, the issue is moot.
Although the theory was not propounded by the plaintiff, the facts of this case might also have raised the issue of whether an employer's removal of a safety device rises to the level of an intentional wrong, thereby triggering the statutory exception to the Workers' Compensation Act in N.J.S.A. 34:15-8. Severe inequities are visited upon workers by the actions of their employers in removing, disconnecting, refusing to install, or otherwise thwarting safety devices that are provided to protect the users of industrial machinery. Such employees are generally left to the inadequate remedies of workers' compensation, virtually sacrificed on the altar of production quotas with no downside risk to the employer.[5] We cannot here pass upon such a claim, but we could *637 envision liability on the part of a corporation whose management personnel or other employees have removed safety devices so that the risk is raised to such a high level that it is practically certain that some employee would be injured. Millison v. E.I. duPont DeNemours & Co., 101 N.J. 161, 185-186, 501 A.2d 505 (1985).
In Millison, the Supreme Court discussed this issue in a different context, but noted that the "intentional wrong" analysis is to be governed by a "substantial certainty" standard. Id. at 178, 501 A.2d 505. The Court stated that the Workers' Compensation Act "is not circumvented simply because a known risk later blossoms into reality. We must demand a virtual certainty." Ibid. "Intentional wrong" includes a subjective desire to injure, but permits evidence of the actor's substantial certainty that injurious consequences will result from his action as proof of a desire to injure. Ibid. We can only suggest that, in the appropriate case, facts such as those in the case before us might be placed before a jury under a thesis that the removal of a safety device constitutes an intentional wrong when the employer knows there is a substantial certainty that a worker will be severely injured.
On the issues that properly survived for consideration by the jury, there is no question that the jury's exoneration of defendants was based upon a sound analysis of the facts after a correct exposition of the relevant law by the trial judge. The judgment rendered on the verdict is affirmed.
NOTES
[1] We have adopted Van Dyk Baler Corporation's attorney's spelling of Van Dyk, rather than the original caption's spelling of "Van Dyke."
[2] There were actually ten such signs on the machine at various points when the machine was originally installed. Some of them carried additional warnings such as "Danger, keep away," which was the sign posted on the needle assembly.
[3] The plant was described as filthy, with a caved in roof and the owner using a bull horn to exhort the workers to increase production.
[4] He had suggested that a safety cable be placed over the machine which would act as a cut off, and Alpha authorized the placement of this cable for a $750 charge.
[5] The employer's exoneration from paying full damages for removing or failing to install safety devices is somewhat ironic when one considers N.J.S.A. 34:15-7, which properly deprives an employee of workers' compensation benefits where the injury or death is intentionally self-inflicted or where the employee is intoxicated or under the influence of drugs. Compensation is also withheld if there has been a "willful failure to make use of a reasonable and proper personal protective device or devices furnished by the employer, which has or have been clearly made a requirement of the employee's employment by the employer and uniformly enforced and which the employer can properly document that despite repeated warnings, the employee has willfully failed to properly and effectively utilize." Ibid. Thus, if an employee is blinded after repeatedly failing to use safety goggles, his blindness goes uncompensated. Yet if the employer cuts away a heavy metal safety grate and requires that the employee place his hand in the potential path of descending spikes, the employer's protections remain intact. We must question the justice of this latter proposition.