OPINION
 

 IRENAS, District Judge:
 

 Plaintiff Pedro Oquendo was injured when his hand was caught in a meat press manufactured by defendant, Bettcher Industries, Inc. (“Bettcher”). The injury may have occurred because plaintiffs employer had removed certain safety devises installed by Bettcher at the time of manufacture. Bettcher now moves for summary judgment on both counts of the complaint — one based on common-law negligence and the other based on products liability. Plaintiff opposes Bettcher’s motion and cross-moves to amend the complaint to name his employer, Quality Foods, L.P. (“Quality”), as an additional defendant.
 
 [1]
 

 Under New Jersey law plaintiffs negligence claim is subsumed in the products liability count. Because plaintiff has adduced insufficient evidence to permit a reasonable fact finder to conclude the meat press, as manufactured, was a defective product, the Court will grant defendant summary judgment. The Court will deny plaintiff leave to amend his complaint to add Quality as there is nothing in the record to suggest a basis for avoiding the workers’ compensation tort bar.
 

 I. BACKGROUND
 

 On April 27, 1994, plaintiff sustained personal injuries while at work using a meat press manufactured by defendant Bettcher. When Bettcher sold the meat press to Quality in April 1980, it contained several safety features including a point-of-operation guard. This guard is essentially a plastic door connected to the circuitry of the meat press. To press meat, the guard must be completely shut, preventing operator contact with the point of operation. When slid open to retrieve the finished product, the guard halts operation of the meat press. The day before the accident, an inspector from the United States Department of Agriculture directed that Quality remove the point-of-operation guard for cleaning and repair. Quality complied and removed the guard accordingly. Despite warnings to the contrary, Quality also rewired the meat press’s circuitry to bypass the interlock mechanism, so that the meat press would not sit idle during the guard’s cleaning and repair.
 

 Defendant Bettcher designed the meat press for use by one operator. To engage the press’s hydraulics, two buttons (away from the point of operation) need be pressed, one with each of the operator’s hands. This feature also promoted worker safety in that an operator pressing the necessary buttons with both hands is safely and physically removed from the point of operation. Despite warnings to the contrary, plaintiffs employer assigned two operators to the meat press.
 

 Defendant Bettcher equipped the meat press with various warnings designed to reinforce the above safety features. A plate on the point-of-operation guard read,
 

 CAUTION. The electrical and hydraulic circuits of this machine have been designed to provide interlocks and safety precautions to mmimize risk of injury to operators and personnel working around the machine. Unauthorized alteration to these circuits may cause injury to the personnel or damage to the equipment.
 

 Watson Aff. at ¶ ll.
 
 [2]
 
 Metal plates affixed beside the guard similarly warned users to “keep [the] guard in place while [the] machine is in operation.” Caution plates and stickers, and the press’s technical manual additionally warned that the machine was designed for one-man loading.
 
 See
 
 Defendant Bettcher’s Ex. E.
 
 [3]
 

 From the depositions and the expert testimony, it is clear that on the day of the accident, the meat press point-of-operation guard was removed and the machine rewired, and plaintiff was one of two individuals oper
 
 *360
 
 ating the machine.
 
 See
 
 Oquendo Tr. at 62 (noting that at the time of the accident the press “didn’t have this door [the point-of-operation guard].”);
 
 id.
 
 at 71 (describing operation by two workers); Plaintiffs Ex. A at 1 (Patton Expert Report).
 

 II. PROCEDURAL ISSUES
 

 A.
 
 Jurisdiction
 

 The Court’s jurisdiction over the case rests on 28 U.S.C. § 1332, which permits district courts to hear eases where the “matter in controversy” exceeds $50,000 and is “between ... citizens of different states.”
 
 Id.
 
 (providing for diversity jurisdiction);
 
 see also Strawbridge v. Curtiss,
 
 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806) (requiring complete diversity — that each plaintiff is from a different state than each defendant). As plaintiff is a citizen of the State of New Jersey and defendant is an Ohio corporation with its principal place of business in a state other than New Jersey, jurisdiction is proper.
 
 See
 
 28 U.S.C. § 1332(c)(1) (deeming a corporation to be a citizen of the state “by which it has been incorporated and of the state where it has its principal place of business”).
 

 B.
 
 Motion to Amend
 

 In his opposition to defendant’s motion to dismiss, plaintiff moves to amend his complaint pursuant to Federal Rule of Civil Procedure 15(a) to name his employer, Quality Foods, L.P., as an additional defendant. As plaintiffs time to amend his pleading as a matter of course has expired, he seeks to amend by leave of court.
 
 See
 
 Fed.R.Civ.P. 15(a).
 

 The Rule states that leave to amend “shall be freely given” and, while a court has discretion to deny leave, that discretion is circumscribed by the liberal amendment philosophy behind the rule. Fed.R.Civ.P. 15(a);
 
 see also Snyder v. Baumecker,
 
 708 F.Supp. 1451, 1456 (D.N.J.1989). Indeed, the moving party ought to be afforded an opportunity to test his claim on the merits, if the underlying facts and circumstances may be a proper subject for relief.
 
 See Foman v. Davis,
 
 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962);
 
 see also Riley v. Taylor,
 
 62 F.3d 86, 90 (3d Cir.1995) (permitting denial if amendment is futile);
 
 Fishbein Family Partnership v. PPG Indus., Inc.,
 
 871 F.Supp. 764, 768 (D.N.J.1994) (“[F]utility is an appropriate ground for denying leave to amend a complaint.”); 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
 
 Federal Practice and Procedure
 
 § 1484, at 637 (2d ed. 1990) (“If the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend.”).
 

 Under New Jersey law, workers’ compensation is the exclusive remedy afforded an employee injured in the course of his employment.
 
 See
 
 Workers’ Compensation Act, N.J.S.A § 34:15-8 (exclusivity provision);
 
 see also Wilson v. Faull,
 
 27 N.J. 105, 116, 141 A2d 768, 774 (1958) (succinctly setting forth the reasons for the exclusiveness of the remedy). For plaintiff to avoid the exclusivity bar, he must show that his employer’s conduct was sufficiently flagrant as to constitute an “intentional wrong.” This is a difficult hurdle.
 
 See Millison v. E.I. du Pont de Nemours & Co.,
 
 101 N.J. 161, 179, 501 A2d 505, 514-15 (1985) (“Although defendants’ conduct in knowingly exposing plaintiffs to asbestos clearly amounts to deliberately taking risks with employees’ health, ... the mere knowledge of a risk— even the strong probability of a risk — will come up short of the ‘substantial certainty’ needed to find an intentional wrong____”).
 

 A New Jersey Appellate Division case has suggested that in an “appropriate case” the removal of safety equipment by an employer might constitute an intentional wrong as articulated by
 
 Millison. See Calderon v. Machinenfabriek Bollegraaf Appingedam BV,
 
 285 N.J.Super. 623, 636-37, 667 A.2d 1111, 1118-19 (App.Div.1995),
 
 certif. denied,
 
 144 N.J. 174, 675 A2d 1122 (1996). Plaintiff offers no facts which suggest that the employer intended or anticipated harm to his employees. This is not a case in which an employer permanently removes or disables safety features for the express purpose of speeding up production, a situation possibly foreseen in
 
 Calderon.
 
 Rather, Quality operated the meat press for many years with the
 
 *361
 
 safety guard, and removed it temporarily for cleaning and repair only when directed to do so by the Department of Agriculture. Preventing the press from sitting idle for a brief period, not inflicting injury, appears to have motivated its alteration.
 
 See
 
 Pappert Cert, at ¶¶ 3-4, 7 (stating that the guard was removed the day before the accident for cleaning and repair). Indeed, plaintiffs complaint which alleges Quality “intentionally exposed plaintiff to probable serious harm” is precisely the conduct that
 
 Millison
 
 describes as inadequate to overcome the tort bar.
 
 See
 
 Proposed Amended Complaint at 2, ¶ 4. Thus, the amendment would be futile, and the Court denies plaintiffs motion for leave to amend his complaint.
 
 See Fishbein,
 
 871 F.Supp. at 768 (judging futility by a motion to dismiss standard).
 
 [4]
 

 III. MOTION FOR SUMMARY JUDGMENT
 

 A.
 
 Standard for Summary Judgment
 

 Under Federal Rule of Civil Procedure 56(c), a court may grant summary judgment “if the pleadings, depositions, answers to interrogatories, and admissions on fide, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact.
 
 See Celotex Corp. v. Catrett,
 
 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 

 In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.
 
 Pollock v. American Telephone & Telegraph Long Lines,
 
 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not “to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
 

 The substantive law governing the dispute will determine which facts are material, and only disputes over those facts “that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.”
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue for trial does not exist “unless the party opposing the motion can adduce evidence which, when considered in light of that party’s burden of proof at trial, could be the basis for a jury finding in that party’s favor.”
 
 J.E. Mamiye & Sons, Inc. v. Fidelity Bank,
 
 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring).
 

 B.
 
 Negligence Count
 

 Under New Jersey products liability law, negligence and breach of warranty are no longer viable as separate claims for harm caused by a defective product.
 
 See
 
 New Jersey Products Liability Act, N.J.S.A. § 2A:58C-1;
 
 Tirrell v. Navistar Intern, Inc.,
 
 248 N.J.Super. 390, 398, 591 A.2d 643, 647 (App.Div.1991) (“[C]ommon-law actions for negligence or breach of warranty are subsumed within the new statutory cause of action”),
 
 certif. denied,
 
 126 N.J. 390, 599 A.2d 166 (1991). Because plaintiffs negligence count alleges harm caused by defendant’s defective product, it falls squarely within the Products Liability Act.
 
 See
 
 N.J.S.A. § 2A:58C-1 (delimiting the scope of the Products Liability Act). Therefore, plaintiffs negligence count is subsumed by his products liability count. Accordingly, the Court will grant defendant summary judgment as to the negligence count.
 

 
 *362
 
 C.
 
 Products Liability Count
 

 There axe three theories under which a manufacturer or seller may be held liable for harm in New Jersey: manufacturing defect, failure to warn, and design defect.
 
 See
 
 N.J.S.A. § 2A:58C-2;
 
 Zaza v. Marquess & Nell, Inc.,
 
 144 N.J. 34, 48, 675 A.2d 620, 627 (1996). Of these, plaintiff advances only two: failure to warn and design defect. Under either theory of products liability, a plaintiff must first prove the existence of a defective condition and that the defect constituted a proximate cause of his injury.
 
 See
 
 N.J.S.A. § 2A:58C-1;
 
 Zaza,
 
 144 N.J. at 49, 675 A.2d at 627. The Court will address each of these issues in turn.
 

 1. Defective Condition
 

 As a prerequisite to recovery in products liability, a plaintiff must prove that the product was defective, and that the defect existed when the product left the defendant’s control.
 
 See Zaza,
 
 144 N.J. at 49, 675 A.2d at 627. Courts have reasoned that “[[liability should be imposed only when the manufacturer is responsible for the defective condition.”
 
 Id.; see also O’Brien v. Muskin Corp.,
 
 94 N.J. 169, 179, 463 A.2d 298, 303 (1983) (articulating the rationale to “prevent[ ] the manufacturer from also becoming the insurer of a product”). The meaning of “defective condition,” though, is not self-evident, and courts have looked to negligence principles for assistance.
 
 See Zaza,
 
 144 N.J. at 49, 675 A.2d at 628 (“[T]he ultimate question to be resolved in design-defect and failure-to-wam cases is whether the manufacturer acted in a reasonably prudent manner in designing and fabricating a product.”);
 
 Feldman v. Lederle Labs.,
 
 97 N.J. 429, 451, 479 A.2d 374, 385 (1984) (noting that “strict liability analysis becomes almost identical to negligence analysis in its focus on the reasonableness of defendant’s conduct”).
 

 New Jersey courts have held manufacturers strictly liable for products, despite another’s subsequent substantial alterations, where those alterations were objectively foreseeable and likely to cause injury.
 
 See Brown v. United States Stove Co.,
 
 98 N.J. 155, 165-68, 484 A.2d 1234, 1239-41 (1984) (requiring a product to be “suitably safe after it has been ... foreseeably altered”);
 
 Soler v. Castmaster,
 
 98 N.J. 137, 151, 484 A.2d 1225, 1232 (1984);
 
 McDermott v. TENDUN Constrs.,
 
 211 N.J.Super. 196, 211-12, 511 A.2d 690, 698-99 (App.Div.1986);
 
 cf. Butler v. Acme Markets,
 
 89 N.J. 270, 445 A.2d 1141 (1982) (imposing liability for negligent failure reasonably to foresee the intentional, willful, or criminal acts of third persons that proximately cause injuries). The parties do not dispute that Quality’s alterations were likely to cause injury. Accordingly, plaintiff need only argue that Quality’s subsequent substantial alterations were objectively foreseeable, thus rendering the product design defective.
 

 Objective foreseeability means reasonable foreseeability. The standard “does not affix responsibility for future events that are only theoretically, remotely, or just possibly foreseeable, or even simply subjectively foreseen by a particular manufacturer.”
 
 Brown,
 
 98 N.J. at 168, 484 A.2d at 1241. Rather, it “applies to those future occurrences that, in light of the general experience within the industry when the product was manufactured, objectively and reasonably could have been anticipated.”
 
 Id.; see also McDermott,
 
 211 N.J.Super. at 211-12, 511 A.2d at 698 (similarly requiring objective, reasonable foreseeability). Plaintiff’s proofs fall short of this standard.
 

 Blurring the distinction between subjective and objective foreseeability, plaintiff argues that defendant’s warnings against removing the point-of-operation guard suggest it foresaw Quality’s subsequent alteration. Indeed, had defendant not foreseen such an alteration it would not have warned as it did. However, such warnings, without more, merely constitute the kind of subjective foreseeability New Jersey courts contemplate as irrelevant to a foreseeability determination.
 
 See, e.g., Brown,
 
 98 N.J. at 167, 484 A.2d at 1241 (deeming the
 
 “conduct
 
 of the manufacturer” not “determinative of the ultimate responsibility for product failure causing accidental injuries);
 
 McDermott,
 
 211 N.J.Super. at 211-12, 511 A.2d at 698 (emphasizing the objective foreseeability requirement). Even viewed subjectively, the warnings only show that the manufacturer might have foreseen
 
 *363
 
 that, without the warnings, its product might be misused in a way that would cause injury. Absent proof that the manufacturer knew or expected its warnings to be ignored, however, the warnings by themselves offers only weak proof of subjective foreseeability — and no proof of objective foreseeability.
 

 Plaintiff next argues that the ease with which Quality removed and bypassed the point-of-operation guard suggests such removal and bypassing were objectively foreseeable. Although his expert opines that the press’s safety features were “easily bypassed,” because the guard was removed and rewired in less than a day,
 
 see
 
 Pappert Cert, at ¶¶ 3-7, nothing in the expert’s report or elsewhere offers any idea of what “easy” means, how the rewiring was accomplished, how long the task took, or what skill level was required.
 

 To be sure, at some point, ease of safety-feature bypass may connote objective foreseeability. For example, a manufacturer that incorporates a safety-device disabling button might reasonably foresee an average user depressing it. However, in an industrial setting, where staff electricians and mechanics provide ready technical expertise, the mere ability to alter the operation of a piece of machinery hardly suggests that such task is either easy or foreseeable.
 
 [5]
 
 Although ease of alteration is probably a meaningful concept in some consumer settings, in an industrial context the connection between ease of alteration and objective foreseeability becomes more tenuous.
 
 See, e.g., Brown,
 
 98 N.J. at 163, 484 A.2d at 1238 (contrasting consumer and industrial treatment of appliances);
 
 Calderon,
 
 285 N.J.Super. at 626, 667 A.2d at 1113 (describing safety interlock-defeating alteration requiring “blow torches, grinders, and precision instruments”). Particularly with complex manufacturing equipment, detailed expert testimony is necessary to correlate safety-defeating ease with objective foreseeability, if such correlation is indeed possible. Plaintiff has offered no such testimony.
 

 Lastly, plaintiff points to defendant’s post-manufacture knowledge that Quality removed the point-of-operation guard at least once before, in 1987, as evidence that such removal was objectively foreseeable. Such knowledge, however, tends to show only subjective foreseeability, and, as discussed above, subjective foreseeability is irrelevant to the foreseeability determination.
 
 See Brown,
 
 98 N.J. at 168, 484 A.2d at 1241. Moreover, defendant only learned of Quality’s removal post-manufacture, whereas the relevant time period for foreseeability is “the time of design and fabrication,” not thereafter.
 
 McDermott,
 
 211 N.J.Super. at 211-12, 511 A.2d at 698-99;
 
 see also Brown,
 
 98 N.J. at 166, 484 A.2d at 1240;
 
 Michalko v. Cooke Color & Chem. Carp.,
 
 91 N.J. 386, 394, 451 A.2d 179 (1982). Plaintiff offers no proof of defendant’s — or any other manufacturer’s— pre-manufacture knowledge.
 

 In short, plaintiff offers nothing to demonstrate the objective foreseeability of Quality’s subsequent alterations.
 
 Cf. Brown,
 
 98 N.J. at 163, 168, 484 A.2d at 1238, 1241 (describing expert testimony that subsequent alterations were “commonplace,” “widespread,” “common knowledge” in defendant’s industry, and therefore “reasonably probable to assume”). His proofs either are inapposite under New Jersey law,
 
 see id.
 
 (discounting testimony regarding subjective foreseeability);
 
 McDermott,
 
 211 N.J.Super. at 211-12, 511 A.2d at 698-99 (disregarding post-manufacture foreseeability), or lack a necessary connection by which one may infer objective foreseeability. Accordingly, plaintiff fails to create a factual issue regarding objective foreseeability.
 

 2. Proximate Cause
 

 Even if the court were to assume,
 
 arguendo,
 
 that the meat press was defectively designed because the subsequent alterations were objectively foreseeable at the time of manufacture, plaintiff would still be required to offer sufficient evidence to permit a jury to determine that this design
 
 *364
 
 defect proximately caused his injury. To demonstrate this causal relationship a plaintiff must proffer evidence “to indicate that[,] with a proper design[,] removal of ... safety features probably could not have been accomplished or even rendered so substantially difficult as to be unlikely.”
 
 Brown,
 
 98 N.J. at 174, 484 A.2d at 1244.
 

 In
 
 Brown
 
 the manufacturer designed a portable gas heating unit with a pilot light tube, thermocouple valve, and gas safety shut off valve. These devices automatically shut off the heater if the gas pressure became too high. They also limited the amount of heat the unit could generate, since higher gas pressures would be needed to burn more gas to produce more heat.
 

 A purchaser of the gas heater removed the pilot light tube, thermocouple valve and gas safety shut-off valve and operated the unit at a gas pressure 100 times greater than its design capacity. Plaintiff was injured by a flareup which resulted when excess gas ignited, an event which would not have occurred if the unit had not been modified. In addition to expert testimony as to how easily the modification could be made, plaintiff offered proof that such changes were “commonplace.” Although the court held that there was a jury issue as to whether the heater’s design was defective, the Supreme Court nonetheless reversed the Appellate Division and reinstated the trial court’s ruling entering judgment for the defendant.
 

 Writing for the Court Justice Handler found that
 

 even were the original design modified in accordance with the plaintiffs proposal, it would not realistically or likely have deterred or obstructed these subsequent abusers of the product or have prevented the kind of injury that resulted from the misuse.
 

 Brown,
 
 98 N.J. at 174, 484 A.2d at 1244. A fifteen year history of misuse convinced the court that any design shortcoming “was only remotely connected with the eventual accident” and “that the subsequent course of conduct was the independent cause” of the heater’s explosion.
 
 Id.
 

 Even if the original design were modified in accordance with plaintiffs very general proposal, the most that can be concluded from the present record is that the point-of-operation guard might be unquantifiably more difficult for Quality’s electricians and mechanics to remove and bypass. “More difficult,” however, falls far short of the applicable preventability or reducibility standard.
 
 See Brown,
 
 98 N.J. at 174, 484 A.2d at 1244.
 

 Plaintiffs expert proposes that the meat press’s operating buttons be moved from their present location and placed on the point-of-operation guard.
 
 See
 
 Plaintiffs Ex. B at 3. Such a configuration, plaintiffs expert contends, would render the safety feature unalterable by “an electrically untrained operator.”
 
 Id.
 
 Plaintiffs expert does not opine whether the electrically interlocked point-of-operation guard, as originally designed, was similarly unalterable by “an electrically untrained operator.” Nor does he opine, more appropriately, whether such a reconfiguration would render the machine unalterable, or even substantially less alterable, by technicians on staff at Quality and at similar meat-pressing plants. As in
 
 Brown,
 
 there is nothing in the record to suggest that simply moving the operating buttons could have deterred Quality from rewiring or modifying the unit to defeat the safety devices. In the real world, it may be difficult to prove that this type of product can ever be designed to reasonably forestall substantial alteration.
 
 [6]
 
 One suspects that with large, complex industrial equipment many, if not most, users will have a significant capability of modifying any machinery they might purchase.
 

 IV. CONCLUSION
 

 Defendant sold a meat presser that was safe if and when operated as it was designed and built. Plaintiff was injured because the purchaser, his employer, modified the machine to bypass its safety mechanisms. New Jersey law considers such a product defectively designed only if (1) it was objectively foreseeable that the subsequent substantial
 
 *365
 
 alteration of the product would create a risk of injury and (2) such defect was the proximate cause of the injury. The Court finds that the record contains no evidence that the alterations were objectively foreseeable. Even were the Court to conclude otherwise, Quality’s subsequent conduct rather that the design of the machine was the proximate and independent cause of the accident.
 

 Because plaintiffs proposed amendment to his complaint would be futile in light of the New Jersey workers’ compensation tort bar, and for the reasons set forth above, the Court will (1) deny the motion to amend the complaint, (2) grant summary judgment as to plaintiffs common-law negligence count as it is subsumed within his products liability claim, and (3) grant summary judgment as to plaintiffs products liability claim. An appropriate order will issue on even date herewith.
 

 [1]
 

 . Plaintiff also sued several fictitious individuals and corporations. Because the deadline for naming fictitious defendants has expired, only defendant Bettcher remains in the action.
 

 [2]
 

 . A December 1989 mailing to Quality reiterated this message.
 
 See
 
 Watson Aff. at Ex. 2.
 

 [3]
 

 . The December 1989 mailing reiterated this message as well.
 
 See
 
 Watson Aff. at Ex. 2.
 

 [4]
 

 . Because the Court denies plaintiff’s leave to amend his complaint, it does not readdress the question of complete diversity were Quality Foods, L.P., a limited partnership including New Jersey citizens and a New Jersey corporation, to become a party.
 
 See Owen Equipment & Erection Co. v. Kroger,
 
 437 U.S. 365, 374, 98 S.Ct. 2396, 2402-03, 57 L.Ed.2d 274 (1978) (reversing for want of jurisdiction where plaintiff amended her complaint to add a defendant of her own state, destroying complete diversity);
 
 see also Strawbridge,
 
 7 U.S. (3 Cranch) at 267 (requiring complete diversity).
 

 [5]
 

 . Perhaps in industrial settings where technical expertise renders almost any alteration possible, economic ease of alteration — whether an alteration is cost-prohibitive — better demonstrates objective foreseeability. However plaintiff neither makes such an argument nor does the record contain any evidence from which the Court may glean Quality’s alteration costs and benefits.
 

 [6]
 

 .
 
 See supra
 
 note 5.