823 A.2d 782

LISA MULL, PLAINTIFF–APPELLANT, v. ZETA CONSUMER PRODUCTS, DEFENDANT–RESPONDENT, AND CUSTOM MACHINE DESIGN, INC. AND XYZ COMPANY, A FICTITIOUS NAME, DEFENDANTS.

Argued February 20, 2003—Decided May 22, 2003.

386

*Jeffrey D. Curzi* argued the cause for appellant (*Morrow and Curzi,* attorneys).

*Thomas A. Wester* argued the cause for respondent (*McDermott & McGee,* attorneys; *Keri Avellini,* on the brief).

The opinion of the Court was delivered by

VERNIERO, J.

The New Jersey Workers' Compensation Act, *N.J.S.A.* 34:15–1 to –128 (the Act), provides the exclusive remedy for claims against an employer when a worker is injured on the job, except for those injuries that have resulted from the employer's "intentional wrong." *N.J.S.A.* 34:15–8. Under that exception, the worker may pursue a common-law remedy in the Law Division. The narrow issue before us is whether plaintiff Lisa Mull is entitled to pursue a common-law remedy for work-related injuries sustained while employed at defendant Zeta Consumer Products. To resolve that issue, we must apply our recent decision in *Laidlow v. Hariton Machinery Co.,* 170 *N.J.* 602, 790 *A.*2d 884 (2002). In so doing, we hold that plaintiff is entitled to proceed with her action in the Law Division.

I.

Briefly stated, these are the pertinent facts. Defendant employed plaintiff as a line operator at its plastic-bag manufacturing facility. One of plaintiff's duties required that she work with a machine known as a "winder," which winds plastic bags onto spools for packaging and delivery. Nylon ropes turn the machine's cylinders. Plastic frequently jammed the machine, sometimes causing the nylon ropes to break. Whenever that occurred, the employer required the line operator to clear the jam and replace the broken ropes, if any.

On March 5, 1997, plaintiff was operating the winder when it became jammed. Plaintiff turned off the machine by pressing the red stop button on the control panel. She then lifted a fiberglass

guard, removed the lodged plastic, and began to replace the broken ropes. Suddenly, the winder began to operate, pulling plaintiff's left hand into the machine. Plaintiff sustained serious injuries, including amputation of her left pinky and ring fingers.

As a result of the incident, the Occupational Safety and Health Administration (OSHA) cited defendant for various safety violations. Several months before, OSHA had cited defendant for failing to provide its employees with so-called lockout/tagout procedures. Those procedures are set forth in federal regulations and essentially are designed to control the release of hazardous energy when a worker is servicing or performing maintenance on equipment or machinery. *See* 29 *C.F.R.* § 1910.147. Also prior to the date of plaintiff's injuries, another line operator, Edin Hasanovic, had been injured when his hand was pulled into the winder, although that prior incident did not occur in exactly the same fashion as had plaintiff's incident. Hasanovic stated that "[o]perators complained all the time about safety but nothing seemed to be done."

Plaintiff filed a complaint in the Law Division, seeking damages against defendant based on an intentional-tort theory. Plaintiff submitted an expert report that expresses the view that defendant, purportedly motivated by a desire to enhance productivity, had altered the original design of the winder. It also refers to another machine known as a "bagger," which was located ahead of the winder on the production line. The report states, in part:

A. The [winder's] original steel hinged cover was replaced with a plexiglass cover.

B. The [winder's] original safety interlock switches (to prevent operation of the machine any time the access cover was opened) had been removed and [were] not replaced with any other equivalent safety device.

C. The wiring and computer control for the operation of the incident winder machine and bagger machine had been modified to operate in a synchronous mode of operation whereby any time the bagger machine was energized, the winder would automatically "START–UP" without any operator intervention.

The report also indicates that there were no warnings posted on the winder to inform workers of its " 'sudden start-up' capabilities" or of the fact that the safety-interlock switches had been

removed. It describes other purported hazards such as "the lack of warnings and instructions to follow a prescribed LOCK OUT/ TAG OUT power termination requirement any time the operator was required to reach into the hinged cover area"; the absence of indicator lights that visually would confirm whether the winder was in an operable mode; and the fact that "[t]he STOP switch ... did not operate in a safe manner." The report concludes that those "hazardous operating conditions" created a "virtual certainty" of injury to the machine's operators.

In addition to her expert's report, plaintiff submitted a certification of a co-employee, Ronald McLane, who stated that he, too, had "observed many things that raised safety concerns." According to that employee, he brought his concerns to management, "but it seemed to go in one ear and out the other." He stated that he was concerned specifically about "the fact that the winder machine could be off and suddenly start up at any time the bagger machine was energized." McLane also described one occasion on which he had been working with the winder when it suddenly began to operate without warning while its power source supposedly was turned off. Although McLane escaped injury on that occasion, he became "alarmed [ ] as to the likelihood of injury," and notified his supervisor of what had occurred.

After discovery, defendant moved for summary judgment, arguing that plaintiff's sole remedy resided within the Division of Workers' Compensation. The trial court denied that motion. The court concluded that a reasonable jury could find that defendant's conduct created a "substantial or virtual certainty" of injury, rising to the level of an intentional wrong. After granting defendant's motion for leave to appeal, the Appellate Division summarily reversed the trial court's decision in an unreported order.

Subsequent to that disposition, we decided *Laidlow*. There, we addressed the Act's intentional-wrong standard and resolved certain conflicting interpretations of this Court's prior decision in *Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 501 *A.*2d 505 (1985). We granted plaintiff's petition for certification

and summarily remanded the matter to the Appellate Division for reconsideration in view of *Laidlow.* 172 *N.J.* 175, 796 *A.*2d 892 (2002). After the remand, the Appellate Division affirmed its prior judgment in an unreported opinion. We granted plaintiff's second petition for certification, 174 *N.J.* 361, 807 *A.*2d 193 (2002), and now reverse.

## II.

 Having described the Act's legislative history most recently in *Laidlow,* we need not repeat it here. Suffice it to say that the Act embodies "an historic 'trade-off' whereby employees relinquish their right to pursue common-law remedies in exchange for prompt and automatic entitlement to benefits for work-related injuries." *Laidlow, supra,* 170 *N.J.* at 605, 790 *A.*2d 884. The Act, however, does not capture all forms of conduct. Most relevant to the present dispute, "an employer who causes the death or injury of an employee by committing an 'intentional wrong' will not be insulated from common-law suit." *Id.* at 606, 790 *A.*2d 884 (quoting *N.J.S.A.* 34:15–8).

In *Laidlow,* the employee had "suffered a serious and debilitating injury when his [gloved] hand became caught in a rolling mill he was operating at his place of employment[.]" *Id.* at 606, 790 *A.*2d 884. The employee alleged that from 1979 to the date of his injury in 1992, the employer had disabled the mill's safety guard. *Id.* at 608, 790 *A.*2d 884. He further alleged that the employer had placed the guard in its proper position only when OSHA inspected the plant. *Ibid.* The employee narrowly escaped injury on a previous occasion when "he was able to slip his hand out of the glove before it was pulled into the machine." *Id.* at 607, 790 *A.*2d 884. Another employee had suffered a similar close call, and both near misses were reported to the employer prior to the incident that resulted in the plaintiff's injuries. *Id.* at 607, 790 *A.*2d 884.

On appeal, we reaffirmed an analytical framework for evaluating the Act's exclusivity provision first articulated in *Millison*. We stated that

under *Millison*, in order for an employer's act to lose the cloak of immunity of *N.J.S.A.* 34:15–8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

[*Laidlow, supra,* 170 *N.J.* at 617, 790 *A.*2d 884.]

That first condition embodies what has become known as *Millison's* "conduct" prong; the second condition reflects the "context" prong. *Id.* at 614–15, 790 *A.*2d 884.

Applying the conduct prong in *Laidlow,* we observed that within the month prior to his incident, the plaintiff had "asked his supervisor three times to restore the guard because the unguarded machine was dangerous and because new and inexperienced employees would be operating it." *Id.* at 621, 790 *A.*2d 884. We also emphasized that "the only time the guard was ever activated by [the employer] was when OSHA inspectors came." *Ibid.* Based on those facts, in addition to "the prior close calls, [and] the seriousness of any potential injury that could occur," we held that a reasonable jury could conclude that the employer "knew that it was substantially certain that the removal of the safety guard would result eventually in injury to one of its employees." *Id.* at 622, 790 *A.*2d 884.

As for the context prong, we concluded:

[I]f an employee is injured when an employer deliberately removes a safety device from a dangerous machine to enhance profit or production, with substantial certainty that it will result in death or injury to a worker, and also deliberately and systematically deceives OSHA into believing that the machine is guarded, we are convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life.

[*Ibid.*]

Lastly, we explained that "the same facts and circumstances" generally will be relevant to both the conduct and context prongs of the *Millison* test. *Id.* at 623, 790 *A.*2d 884. We stated that in

evaluating a potential cause of action, a trial court must evaluate whether a plaintiff has satisfied each prong of the analysis. We further explained that determining whether the context prong has been satisfied "is solely a judicial function." *Ibid.* "Thus, if the substantial certainty standard presents a jury question and if the court concludes that the employee's allegations, if proved, would meet the context prong, the employer's motion for summary judgment should be denied; if not, it should be granted." *Ibid.*

## III.

The facts in this case are similar to those found in *Laidlow.* Plaintiff alleges that her employer disengaged the winder's critical safety devices, knowing of the dangerous consequences of such conduct. She asserts that Hasanovic's prior accident, McLane's safety concerns, and OSHA's prior citations, all known to the employer, underscored the machine's hazardous condition. According to plaintiff's expert, defendant's purported failure to provide lockout/tagout procedures made harm to defendant's employees predictable. We agree with the trial court that the foregoing facts, if proved, could result in a reasonable jury finding that defendant's conduct created "substantial certainty" of injury consistent with the case law just cited.

Defendant contends that its lack of deception toward OSHA warrants a contrary conclusion. We disagree. Although the employer's purported deception in *Laidlow* was a prominent factor in our analysis, we emphasized in that case that no one fact compelled our holding. In that respect, we stated as guidance to future courts and litigants that "our disposition in such a case [involving removal of safety devices] will be grounded in the *totality of the facts* contained in the record[.]" *Laidlow, supra,* 170 *N.J.* at 623, 790 *A.*2d 884 (emphasis added). Following that approach here, we are persuaded that plaintiff has satisfied *Millison's* conduct prong.

We also agree with plaintiff that she has satisfied the context prong. We again echo *Laidlow.* The Legislature would not have

considered the removal of the winder's safety devices, coupled with the employer's alleged knowledge of the machine's dangerous condition due to prior accidents and employee complaints, in addition to OSHA's prior violation notices, "to constitute simple facts of industrial life." *Id.* at 622, 790 *A.*2d 884. Plaintiff, therefore, has satisfied both prongs of *Millison*, entitling her case to proceed in the Law Division.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for further proceedings consistent with this opinion.

ZAZZALI, J., concurring.

I concur in the judgment of the Court. I write separately from Justice Verniero's thoughtful opinion to add the following.

I would find that when, as here, evidence suggests that an employer disabled or knowingly tolerated the disabling of a safety device, it creates a rebuttable presumption that the employer knew harm to an employee was substantially certain to result. Under that rule, the employer would have the burden of coming forward at trial with evidence tending to disprove that known substantial certainty of harm. In the absence of such evidence, if the jury found that an employer disabled or knowingly tolerated the disabling of a safety device, it would have to conclude that a known substantial certainty of harm existed. Conversely, if an employer introduces evidence tending to show that it did not know harm was substantially certain to result, the presumption would be rebutted. The jury then would determine whether the employer in fact possessed such knowledge regarding the likelihood of harm. *See generally N.J.R.E.* 301 (setting forth procedures by which rebuttable presumption applies at trial).

When an employer decides to permit the disabling of a safety device, divining the presence of a known substantial certainty of harm requires evidence of an employer's appreciation of the risk

presented by its decision. It is the rare case in which an employee will have access to such evidence. *See Stepanischen v. Merchants Despatch Transp. Corp.*, 722 *F.*2d 922, 928 (1st Cir. 1983)("In cases where . . . the state of mind of one of the parties is crucial to the outcome of the case, resort to summary judgment is vested with more than the usual difficulty."). By contrast, the employer enjoys unfettered access to its own history of workplace injuries, OSHA citations, precautionary measures taken, and cost-benefit analyses conducted and therefore is better prepared to explain why it concluded that the risk of harm presented by a disabled safety device is less than a substantial certainty. A rebuttable presumption properly places on the employer the burden of coming forward with evidence to support that explanation. *See United States v. One Parcel of Prop.*, 85 *F.*3d 985, 990 (2nd Cir.1996)("Burden-shifting where one party has superior access to evidence on a particular issue is a common feature of our law.").

The rule I propose also deters the indiscriminate disabling of safety devices by making tort liability likely when an employer permits a safety device to be disabled but lacks evidence to show ignorance of a substantial certainty of harm. *See* Sidney Shapiro and Randy Rabinowitz, *Voluntary Regulatory Compliance in Theory and Practice: The Case of OSHA*, 52 *Admin. L.Rev.* 97, 153 (2000)("The threat of tort liability creates incentives for firms to prevent accidents and illnesses."). Although the prospect of workers' compensation liability presents some level of employer deterrence, it is less than optimal because such liability "does not fully compensate for injuries and employers insure against such losses." *Ibid.* Without the protection of an employer's potential liability in tort, "employees are generally left to the inadequate remedies of workers' compensation, virtually sacrificed on the altar of production quotas with no downside risk to the employer." *Calderon v. Machinenfabriek Bollegraaf Appingedam BV*, 285 *N.J.Super.* 623, 636, 667 *A.*2d 1111 (App.Div.1995), *certif. denied*, 144 *N.J.* 174, 675 *A.*2d 1122 (1996). As a rash of litigation in this and other jurisdictions indicates, disregard for compliance with OSHA requirements, including the disabling of devices designed to

ensure the safety of employees, is a phenomenon endemic to the modern workplace. *See* Samuel J.M. Donnelly and Mary Ann Donnelly, *1997–1998 Survey of New York Law: Commercial Law,* 49 *Syracuse L.Rev.* 271, 278 (1999)(recognizing "the enormous number of cases in our state where safety devices have been removed or modified"). A rebuttable presumption that promotes tort liability when an employer cannot justify the disabling of safety devices provides a welcome deterrent to employer misconduct.

A rebuttable presumption also encourages a fairer distribution of the costs of workplace injury between manufacturers and employers. Under *Laidlow v. Hariton Machinery Co., Inc.,* 170 *N.J.* 602, 790 *A.*2d 884 (2002), and *Millison v. E.I. du Pont de Nemours & Co.,* 101 *N.J.* 161, 501 *A.*2d 505 (1985), an employer is immunized from suit under *N.J.S.A.* 34:15–8 for the disabling of a safety device in the absence of a known substantial certainty of harm. That immunity also extends to actions brought by manufacturers seeking indemnification from employers when employees successfully sue those manufacturers on the basis of product liability. *Ramos v. Browning Ferris Indus. of S. Jersey, Inc.,* 103 *N.J.* 177, 185, 510 *A.*2d 1152 (1986). Our product liability jurisprudence provides, however, that a manufacturer may be held liable for injuries resulting from the disabling of a safety device or other misuse of a product when a jury concludes that such misuse was "objectively foreseeable." *Jurado v. Western Gear Works,* 131 *N.J.* 375, 385, 619 *A.*2d 1312 (1993). Consequently, product manufacturers often bear all of the costs of the employee injuries that result from such misuse, including injuries caused by an employer's modification of an otherwise safe product. William A. Dreier and Lawrence N. Lavigne, *Untying the Laidlow Knot: Shifting Liability from Machine Manufacturers to Employers That Continue to Use Machines That Have Known Design Defects,* 170 *N.J.L.J.* 810, 812 (Dec. 9, 2002). The rule I propose helps to mitigate that unfairness by facilitating indemnification for manufacturers, thereby promoting a more equitable distribution of the costs of employee injury.

Finally, it is important to note that my proposal, consistent with the Court's decision in *Laidlow, supra,* does not establish a *per se* rule "that an employer's conduct equates with an 'intentional wrong' within the meaning of *N.J.S.A.* 34:15–8 whenever that employer removes a guard or similar safety device from equipment or machinery, or commits some other OSHA violation." 170 *N.J.* at 622, 790 *A.*2d 884. As noted, a rebuttable presumption permits the employer to introduce evidence at trial tending to show that a known substantial certainty of harm did not exist and then allows the jury to make that factual assessment. It does not trigger automatic liability for an employer on a finding that a safety device has been disabled. Instead, it properly places on employers the burden of coming forward with evidence regarding their state of mind, deters employers from maintaining a workplace in which safety devices are removed as a matter of course, and promotes more equitable distribution of the costs of workplace injuries between manufacturers and employers. For those reasons, I believe application of such a presumption is appropriate on the facts of this appeal and in all cases in which an employer's decision to tolerate the removal of a safety device results in harm to an employee.

ALBIN, J., concurring.

Although I concur in the judgment of the Court, I believe it is time to adopt a clear and precise rule that an employer's willful and knowing disengagement or removal of a safety device, the purpose of which is to protect an employee from death or serious bodily injury, constitutes an intentional wrong under *N.J.S.A.* 34:15–8, stripping the employer of immunity from common-law tort actions. Temporary removal or disengagement of a safety device for repair, maintenance, or some other benign purpose would not be actionable. However, the willful and knowing removal or disengagement of a safety device intended to protect the worker can no longer be a simple fact of industrial life. Such conduct alone is a total breach of the social contract between employer and employee, and, under those circumstances, the

employer should be barred from the safe haven of the Workers' Compensation Act. *See Tomeo v. Thomas Whitesell Constr. Co.,* 176 *N.J.* 366, 380–85, 823 *A.*2d 769, 779–82 (2003) (Albin, J., dissenting). Justice Zazzali's well-reasoned and thoughtful concurrence sets forth an incremental approach that, in my opinion, does not go far enough.

*For reversal and remandment*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

. *Opposed*—None.