833 A.2d 650 (2003)
363 N.J. Super. 457
Robert L. FISHER, Sr. and Loretta Fisher, Administrator and Administratrix Ad Prosequendum and General Administrators of the Estate of Robert L. Fisher, Jr., Plaintiffs-Appellants,
v.
SEARS, ROEBUCK & CO., a New York Corporation, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 2003.
Decided October 27, 2003.
*652 Paul Faugno, Hackensack, argued the cause for appellants (Rogan & Faugno, attorneys; Mr. Faugno, on the brief).
Edward J. Fanning, Jr., Newark, argued the cause for respondent (McCarter & English, attorneys; David R. Kott, of counsel; Mr. Fanning and Paul A. Witte, on the brief).
Michael A. Galpern, Cherry Hill (Law Offices of Gene Locks appearing amicus curiae on behalf of Association of Trial Lawyers of America, New Jersey Chapter; Mr. Galpern and Christine Klimsuk, on the brief).
McElroy, Deutsch & Mulvaney, Morristown (appearing amicus curiae on behalf of New Jersey Business and Industrial Association; Michael J. Marone and Richard J. Williams, Jr., of counsel; and on the brief).
Before Judges NEWMAN, FALL and PARRILLO.
*651 The opinion of the court was delivered by PARRILLO, J.A.D.
Plaintiffs Robert L. Fisher, Sr., Administrator, and Loretta Fisher, Administratrix ad Prosequendum, and General Administrators of the Estate of Robert L. Fisher, Jr., appeal from entry of an order on December 12, 2001, granting summary judgment in favor of defendant Sears, Roebuck & Co. (Sears or defendant), dismissing their wrongful death action. In this appeal, we are once again asked to determine whether the exclusive-remedy provision of the workers' compensation statute, N.J.S.A. 34:15-8, bars plaintiffs from filing a common law tort action against decedent's employer. This time, however, the incident giving rise to the cause of action did not occur in the typical industrial-manufacturing setting, but rather in the parking lot of a Sears store where decedent was killed by two armed robbers while transporting $7,000 in cash proceeds from one facility to another within defendant's Hackensack complex.
On review of this summary judgment determination, we view the facts in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146, 156 (1995). They may be briefly stated. Decedent was an "asset protection associate" employed by defendant at its store located in Hackensack. The Hackensack facility actually consists of three separate detached structurestwo outlying buildings and the main store. During the evening of April 19, 1996, at the close of business and as part of his job duties, decedent locked up one of the outlying buildings and carried a locked metal toolbox containing the day's monies and receipts to his car for further transport to the main building, its final destination. His car was parked only a few feet from the door of the building he was leaving, in what plaintiffs describe as a dimly lit parking lot separating the three buildings. En route to his car, decedent was accosted by two armed assailants. A struggle ensued for the toolbox during which decedent was fatally shot.
At the time of this incident, there was a corporate directive in effect regarding on-site transfers of funds at Sears facilities consisting of more than one building, in the northern New Jersey region. This regional directive restricted the collection and transportation of monies between buildings to morning hours and in the presence of two "asset protection" or security guards. Sears also had a longstanding national policy that its asset protection *653 employees were not permitted to carry firearms in the course of their employment.[1]
For at least six months prior to the incident, Sears' Hackensack facility had not implemented this regional directive. Instead, during this time, defendant's asset protection employees collected and transported store proceeds alone and at nighttime hours. Apparently this practice of transferring funds at the close of business rather than the following business day continued in an effort to stem unresolved shortages of money left overnight in the outlying buildings. While this practice remained in effect, no complaints or objections were voiced and no incidents, save for decedent's, were reported. In fact, prior to this incident, there were no reports of murders, rapes, robberies or similar violent crimes at Sears Hackensack property or in the area immediately surrounding the store.[2] Plaintiffs were able to refer to only two incidents, both remote in time, place and circumstance to that involving decedent. One concerned a purse snatching at Sears' Staten Island facility and another, a fatal shooting of an employee of Sears' Bergenfield store over eight years before decedent's incident and occurring outside her home in New Milford. In any event, there was no evidence that personnel at the Hackensack facility were aware of either incident.
As a result of decedent's homicide, his estate filed a Workers' Compensation Dependency Claim Petition against defendant on behalf of decedent's two year old son. On June 9, 1997, an order was entered by the Workers' Compensation Board approving an award of full benefits, which Sears has been paying and is ordered to pay until decedent's son reaches eighteen years of age. On April 17, 1998, plaintiffs, on behalf of decedent's estate, filed this wrongful death lawsuit in the Law Division against Sears and other defendants[3], alleging that:
Having actual knowledge of the dangerousness of the activity being undertaken, having actual and constructive knowledge of the high incidence of crime in the particular area, having actual knowledge of the risk in conducting such an activity, and having actual knowledge of the probability that such an unorthodox procedure in transporting cash would ultimately result in a criminal encounter, the Defendant, Sears, nonetheless violated its own policy of requiring two store personnel to transport cash. By thus compelling Robert L. Fisher, Jr. on the night of April 19, 1996 to transport such sums of money without being armed and alone, constitutes deliberate actions on the part of Defendant, Sears, and the same was a proximate cause of the crime committed against Decedent, Robert L. Fisher, Jr.
Plaintiffs thereby contended that defendant's conduct fell within the "intentional wrong" exception to the exclusive remedy *654 provision of the New Jersey Workers Compensation Act (Act), N.J.S.A. 34:15-8, which provides that:
If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

[N.J.S.A. 34:15-8 (emphasis added).]
After completion of full discovery, defendant moved for summary judgment on the basis of the Act's exclusivity provision, maintaining that its conduct did not amount to an "intentional wrong." The motion judgment agreed, stating:
The Court is satisfied that there is no material or substantial fact that is in dispute in this case. The only item that plaintiffs assert as a possible dispute is that defendant Sears violated their ownthe Sears' national policy....
The Court still finds from the material that follows that I cannot consider that[,] the type of virtual certainty that would create an intentional act of the employer.
....
Fisher was trained to confront and/or quell the very risks that he encountered. [Fisher] never had complained about pick-up or transportation of money at night as he was doing the night of his demise. Fisher had no gun because of his own status that nightthat is, of a suspended police officerand because... defendant Sears always [had] a no-gun policy. So it was, at best, a mixed situation. Fisher does not allege any crimes of significance on or near the Hackensack store that would have put him or the store on notice of any potential robbery/murder incidents.
Fisher's crime statistics, as presented to the Court, for the town are not sufficient to create any fact issue here concerning the intent that Sears as an employer had with regard to Fisher and Fisher's position related to the question of virtual certainty of being shot and killed.
Accordingly, an order was entered granting summary judgment in favor of defendant and dismissing plaintiffs' complaint. Plaintiffs appeal, essentially arguing that Sears' circumvention of its own safety policy and procedures satisfies the "intentional wrong" standard.
It is by now settled that to satisfy the "intentional wrong" standard, a plaintiff must meet a two-prong test first articulated in Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 179, 501 A.2d 505, 514 (1985), that focuses on the nature of the employer's conduct and the context within which that conduct occurred. See Laidlow v. Hariton Machinery Co., 170 N.J. 602, 790 A.2d 884 (2002). In Laidlow, the Court explained in detail what is expected in deciding motions for summary judgment based on the workers' compensation bar in N.J.S.A. 34:15-8:
[A]s a practical matter, when an employee sues an employer for an intentional tort and the employer moves for summary judgment based on the Workers' Compensation bar, the trial court must make two separate inquiries. The first is whether, when viewed in a light most favorable to the employee, the evidence could lead a jury to conclude that the employer acted with knowledge that it was substantially certain that a worker would suffer injury. If that question is answered affirmatively, the trial court must then determine whether, if the employee's allegations are proved, they constitute a simple fact of industrial life or are outside the purview of the conditions *655 the Legislature could have intended to immunize under the Workers' Compensation bar. Resolving whether the context prong of Millison is met is solely a judicial function. Thus, if the substantial certainty standard creates a jury question and if the court concludes that the employee's allegations, if proved, would meet the context prong, the employer's motion for summary judgment should be denied, if not, it should be granted.
[Laidlow, 170 N.J. at 623, 790 A.2d at 898.]
Laidlow resolved certain conflicting interpretations of the Court's prior decision in Millison. See Mull v. Zeta Consumer Products, 176 N.J. 385, 389, 823 A.2d 782, 784 (2003). Thus, it is now clear that an "intentional wrong" is not limited to the traditional assault and battery, or to actions taken with a subjective intent to harm, but also includes instances where an employer knows that the consequences of its acts are substantially certain to result in harm or injury to an employee. Laidlow, supra, 170 N.J. at 613, 617-18, 790 A.2d at 894 ("test encompass[es] acts that the employer knows are substantially certain to produce injury even though, strictly speaking, the employer does not will that result."). On the other hand, the standard does not reach conduct evincing mere knowledge and appreciation of a risk, id. at 615, 790 A.2d at 892-93; Millison, supra, 101 N.J. at 179, 501 A.2d 505; Marinelli v. Mitts & Merrill, 303 N.J. Super. 61, 72, 696 A.2d 55, 60-61 (App.Div.1997), or even a strong probability of risk. Tomeo v. Thomas Whitesell Construction Co., 176 N.J. 366, 376, 823 A.2d 769, 776-77 (2003); Millison, supra, 101 N.J. at 179, 501 A.2d at 514-15. While such an awareness or recognition may define negligence or recklessness, it does not constitute an "intentional wrong", coming up short on the "substantial certainty" prong. Indeed, substantial certainty equates to a "virtual certainty". Millison, supra, 101 N.J. at 178-79, 501 A.2d at 514-15.
Cases interpreting the "intentional wrong" standard have arisen for the most part in the manufacturing sector and generally have involved the circumstance of an employer intentionally removing or disabling a safety device on a piece of industrial production machinery used in the employer's business. Beginning with Laidlow, courts have eschewed a per se rule in favor of one grounded in the totality of the facts. Laidlow, supra, 170 N.J. at 622-23, 790 A.2d at 897-98. In other words, while removal of a safety guard can meet the intentional wrong standard, it is not a per se intentional wrong. Such a determination requires a case-by-case analysis. Id. at 619, 790 A.2d at 896.
Of course, the context within which the conduct occurs is also as important in defining an intentional wrong. Millison, supra, 101 N.J. at 179, 501 A.2d at 514-15. In general, the same facts and circumstances will be relevant to both the conduct and context prongs of the intentional wrong standard. Under the latter, courts must determine whether the resulting injury or death, and the circumstances surrounding it, fairly may be viewed as a simple fact of industrial life, or rather, whether it is "plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act[.]" Ibid. See also Crippen v. Central Jersey Concrete Pipe Co., 176 N.J. 397, 406-07, 823 A.2d 789, 794-95 (2003). Where the circumstances under which a safety device is disabled are so egregious the action could not have been contemplated by the Legislature in enacting the Act, the context prong has been satisfied. Laidlow, supra, 170 N.J. at 622, 790 A.2d at 897-98; Mabee v. Borden, *656 Inc., 316 N.J.Super. 218, 228, 720 A.2d 342, 347 (App.Div.1998).
Laidlow presented such a case. There, the employee suffered a serious injury when his gloved hand became caught in a rolling mill he was operating at his place of employment. Laidlow, supra, 170 N.J. at 606, 790 A.2d at 887. The employee narrowly escaped injury on a previous occasion when "he was able to slip his hand out of the glove before it was pulled into the machine." Id. at 607, 790 A.2d at 888. Another employee had suffered a similar close call, and both near misses were reported to the employer prior to the incident that resulted in plaintiff's injuries. Id. at 607, 790 A.2d at 888.
The employer purchased a safety guard for the mill in 1979, but it was purposely kept disengaged up until the date of Laidlow's accident thirteen years later. Id. at 608, 790 A.2d at 888. The guard was placed in its proper position only when Occupational Safety and Health Administration (OSHA) inspectors came to the plant. Ibid. Prior to Laidlow's accident, he had asked one of his superiors three times to restore the guard to its proper working position. Ibid. The employer ignored those requests, and conceded "that the guard was removed for `speed and convenience.'" Ibid. Laidlow retained a professional engineer who certified that the employer "knew there was a virtual certainty of injury to Mr. Laidlow or a fellow work[er] arising from the operation of the mill without a guard." Id. at 608-09, 790 A.2d at 888.
Based on the evidence showing "prior close calls, the seriousness of any potential injury that could occur, Laidlow's complaints about the absent guard, and the guilty knowledge of [the employer] as revealed by its deliberate and systematic deception of OSHA", id. at 622, 790 A.2d at 897-98, the Court concluded that a jury could find Laidlow's employer knew that it was "substantially certain that the removal of the safety guard would result eventually in injury to one of its employees." Ibid. Thus, it was inappropriate to grant summary judgment on the substantial certainty issue as a jury question was presented. Ibid.
This same result was reached in Mull v. Zeta Consumer Products, 176 N.J. 385, 823 A.2d 782 (2003) on facts similar to those in Laidlow with the exception that in Mull, there was no deception of OSHA. There were, however, prior OSHA citations for the employer's failure to provide its employees with so-called lockout/tagout procedures designed to control the release of hazardous energy when a worker is servicing or performing maintenance on equipment or machinery. 176 N.J. at 388, 823 A.2d at 783-84. The plaintiff in Mull was seriously injured while attempting to clear a jam in a winder machine she was operating. Ibid. She turned off the machine by pressing the red stop button on the control panel. Id. at 387, 823 A.2d at 783. She then lifted the fiberglass guard, removed the lodged plastic, and began to replace the broken ropes. Id. at 388, 823 A.2d at 783. Suddenly, the winder began to operate, pulling plaintiff's left hand into the machine. Ibid.
Prior to the plaintiff's injuries, another line operator had been injured when his hand was pulled into the winder, although that prior incident did not occur in exactly the same fashion as had plaintiff's incident. That employee stated that "[o]perators complained all the time about safety but nothing seemed to be done." Id. at 388, 823 A.2d at 784. In fact, another co-worker brought his concerns to management, "but it seemed to go in one ear and out the other." Id. at 389, 823 A.2d at 784. The plaintiff's expert concluded that the hazardous operating conditions, including *657 the lack of warnings and the failure to provide lockout/tagout procedures, made harm to the defendant's employees not only predictable but a "virtual certainty." Ibid.
Based on the co-worker's prior accident, the safety concerns expressed to management, and OSHA's prior citations, the Court held that these facts, if proved, could result in a reasonable jury finding that defendant's conduct created "substantial certainty" of injury. Id. at 392, 823 A.2d at 786. The absence of any deception toward OSHA on the employer's part did not warrant a contrary conclusion since the totality of the facts in the record persuaded the Court that a jury question was presented.
The same jury question was presented on the totality of the facts in Crippen, supra, where an employee, responsible for controlling the movement of sand and gravel into loading hoppers located in an elevated shed, fell into the sand hopper and suffocated. 176 N.J. at 399-400, 823 A.2d at 790-91. In a prior OSHA citation, the employer was informed that the area where the employee's death occurred was a confined space and that it was also a lockout/tagout area. Id. at 404, 823 A.2d at 793. Nevertheless, according to the plaintiff, the employer deliberately failed to correct the OSHA violations and intentionally deceived OSHA into believing that it had abated the violations because it did not want OSHA to return to the plant. Id. at 410, 823 A.2d at 797. According to the plaintiff's expert, the employee, who was required to walk on a single two-inch by ten-inch wooden plank and stand on a six-foot high unsecured ladder that rested on the wooden plank, died "because he was allowed to enter a [`permit-confined' space] without a permit and without having the proper lockout/tagout so that the mixer operator would not open the pneumatic gate and cause a discharge of the hopper content." Id. at 404, 823 A.2d at 793.
Although there were no prior incidents involving the hopper, the defendant's own environmental health and safety manager admitted that he knew there was a substantial certainty that an employee could die in one of the plant's permit-required confined spaces, an admission imputed to the defendant employer. Stating that the "absence of a prior accident does not preclude a finding of an intentional wrong", id. at 408, 823 A.2d at 796 (citing Laidlow, supra, 170 N.J. at 621, 790 A.2d at 897), the Court held that "[b]ased on the totality of the circumstances, ... a jury reasonably could conclude that the `substantial certainty' prong of the Millison test was satisfied." Id. at 410, 823 A.2d at 797.
As this post-Millison trilogy of cases makes clear, no one fact is dispositive and the ultimate determination as to an intentional wrong "will be grounded in the totality of the facts contained in the record[.]" Laidlow, supra, 170 N.J. at 623, 790 A.2d at 898 (emphasis added). Thus, for instance, just as the absence of a prior accident does not preclude a finding of an intentional wrong, id. at 621, 790 A.2d at 897, neither does an employer's violation of an OSHA regulation establish that fact as a per se rule. Id. at 622, 790 A.2d at 897-98. In each of these cases, although one or more of these factors may have been lacking, nevertheless there was sufficient other evidence considered in the "substantial certainty" analysis to warrant submission of that issue to the jury and to defeat the summary judgment motion.
Outside the industrial-manufacturing context, however, courts have generally been reluctant to find satisfaction of the "intentional wrong" standard. For example, in McGovern v. Resorts International Hotel, Inc., 306 N.J.Super. 174, 703 A.2d 364 (App.Div.1997), a security supervisor *658 was shot while she was transporting money across the gaming room floor at the casino where she was employed. Id. at 176, 703 A.2d at 365. Despite recommendations and complaints from the security team to management concerning the moving of money from the cage to the armored vehicles, Resorts continued to order its security personnel to perform this operation in the presence of the public. Ibid. Resorts was only one of two casinos that transferred money in this manner and would not change its procedure for cost reasons, since designing a secured money route would cost the company $50,000. Id. at 177, 703 A.2d at 366. We found these facts simply did not rise to the level that would permit the plaintiff to seek a remedy outside of the Act, reasoning that "Resorts did not intentionally remove any safety devices or procedures intended for the protection of its employees and the harm inflicted upon plaintiff was an illegal act of a third party." Id. at 181, 703 A.2d at 368.
In Tomeo v. Thomas Whitesell Const., supra, an employee was injured operating a snow blower, used to remove snow from sidewalks at the premises of the employer whose normal business was installing sprinkler systems in commercial buildings. 176 N.J. at 366, 823 A.2d at 769. The employer had deactivated the safety lever by taping it in the operational position with electrical tape. Id. at 368, 823 A.2d at 770. The snow blower also contained two visible warning labels with respect to dangers associated with inserting a body part into the chute. Id. at 375, 823 A.2d at 776. Nevertheless, each time wet snow clogged the chute on the day of the accident, the plaintiff would use his hands to push the snow down in the chute and the propellers would then eject the snow through the chute. Id. at 368, 823 A.2d at 770. The last time plaintiff attempted that maneuver, the propeller that ejects the snow through the chute caught his hand, causing injuries to his fingers. Ibid. Because the lever had been taped, the propellers continued to operate. Ibid. The Court, in affirming the grant of summary judgment, held there was a lack of evidence that the employer knew there was a virtual certainty that an employee would be injured from using the snow blower in that condition. Id. at 374, 823 A.2d at 775.
Both Resorts and Tomeo occurred outside the industrial-manufacturing setting and each lacked the "exclusive control" element inherent in the use of industrial production machinery. Significantly, in Tomeo, the snow blower was a consumer product not part of the equipment or machinery used to produce or install sprinklers in commercial buildingsthe business purpose of the defendant. Thus, in analyzing both the conduct and context prongs, the Court, borrowing freely from products liability law the concepts of consumer-user expectation, obviousness of danger, and comparative negligence, considered the conduct of the employee as well, including the fact that he had received some training on the use of the snow blower, and concluded neither prong had been satisfied. Tomeo, supra, 176 N.J. at 375-78, 823 A.2d at 775-78.
Likewise, in Resorts there was an intervening-superceding cause that affected both the substantial certainty and context prongs. However, instead of the employee's comparative negligence present in Tomeo, the harm inflicted upon the plaintiff in Resorts was an illegal act of a third party over whom the employer had no real, much less exclusive, control. 306 N.J.Super. at 181, 703 A.2d at 368.
Such is the case here. We are persuaded that the evidence falls far short of meeting either the conduct or context prong of the Millison test.
*659 As to the conduct prong, lacking here are the egregious circumstances that characterized the Laidlow-Mull-Crippen trilogy. There were no prior incidents of violence at the Hackensack facility to place the employer on notice of a real security problem. Neither were any complaints voiced by security personnel to management over the money transfer procedures actually followed, nor recommendations made to change or modify the practice. Significantly, defendant was out of compliance only with corporate policy, not governmental mandates of a regulatory or supervisory agency. And in the six months defendant was non-compliant, no problems were encountered or reported.
To be sure, defendant's failure to implement the regional directive at its Hackensack facility was not mere oversight; however its practices there were open, not secret, and no attempt was made to conceal this fact from, or deceive, corporate headquarters. Compare Laidlow, supra, 170 N.J. at 621, 790 A.2d at 897 ("By its deception, a jury could conclude that [defendant] evidenced an awareness of the `virtual' certainty of injury from" its failure to correct the safety hazards.). Although plaintiffs make much of the fact that such a policy evinces an awareness of the dangers inherent in acting to the contrary, nevertheless an employer's knowledge and appreciation of a significant risk does not constitute the requisite intent needed to circumvent the Act. Laidlow, supra, 170 N.J. at 615, 790 A.2d at 892-93; Millison, supra, 101 N.J. at 179, 501 A.2d at 514-15. Even a known risk may not suffice. Millison, supra, 101 N.J. at 178, 501 A.2d at 514. Under the circumstances, we conclude that defendant's failure to implement corporate policy, without more, does not constitute a per se intentional wrong and cannot equate to a "virtual certainty" that harm to an employee will ensue as an inevitable consequence.
While we find the conduct prong not established as a matter of fact, we conclude the context prong fails as a matter of law. Missing from the facts here are the deception and blatant disregard for plaintiff's well-being that was present in Mabee; Millison; Laidlow and Crippen, or evidence of conduct that demonstrates defendant "violate[d] the social contract so thoroughly that we are confident the Legislature would never expect it to fall within the Workers['] Compensation bar." Laidlow, supra, 170 N.J. at 622, 790 A.2d at 898. On the contrary, defendant's failure to implement the regional-level policy, although perhaps evidential of negligence or even recklessness, was at least explained by a legitimate business purpose. Moreover, plaintiffs' decedent was a former law enforcement official and at the time of his death, a private security guard. In those capacities he knew full well the dangers and risks inherent in the unarmed transportation of cash at night and alone, yet never complained of the practice. Although decedent's homicide was indeed tragic, dangerous activity is a fact of life for security guards and the "type of hazard of employment that the legislature anticipated would be compensable under the terms of the ... Act." Millison, supra, 101 N.J. at 179, 501 A.2d at 515. It was also, as in Resorts, well beyond the exclusive control of the defendant to avoid. Simply put, the proofs here do not support a finding that the harm to decedent is "more than a fact of life of [his] ... employment and ... plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize." Laidlow, supra, 170 N.J. at 617, 790 A.2d at 894. Defendant's motion for summary judgment was properly granted.
Affirmed.
NOTES
[1] At the time of his death, decedent was working for Sears while on suspension from his position as a police officer with the Teaneck Police Department. Decedent's service weapon was confiscated at the time of his suspension. Due to his suspension, decedent was not allowed to carry either his service weapon or his personal weapon.
[2] There was mention in plaintiffs' expert's report that a former security director had been badly beaten in the parking lot of the Hackensack facility "some years ago", but we discern no competent proof of this assertion in this record. In any event, the expert report details neither the circumstances surrounding the alleged assault nor when it supposedly occurred.
[3] The claims against the other co-defendants have been dismissed and are not the subject of this appeal.