2 A.3d 456 (2010)
415 N.J. Super. 490
Kenneth VAN DUNK, Sr. and Deborah Van Dunk, Plaintiffs-Appellants,
v.
RECKSON ASSOCIATES REALTY CORPORATION; Reckson Construction and Development, LLC; Paulus, Sokolowski & Fleming, Inc.; and Joseph Fleming, P.E., Defendants, and
James Construction Company, Inc., Defendant-Respondent.
No. A-3548-08T2.
Superior Court of New Jersey, Appellate Division.
Argued January 21, 2010.
Decided August 30, 2010.
*457 Glenn M. Gerlanc, Hackensack, argued the cause for appellants (Parisi & Gerlanc, P.A., attorneys; Mr. Gerlanc, of counsel and on the brief; Steven M. Davis, on the brief).
George J. Kenny, Roseland, argued the cause for respondent (Connell, Foley LLP, attorneys; Mr. Kenny, of counsel and on the brief).
Before Judges STERN, GRAVES and NEWMAN.
The opinion of the court was delivered by
STERN, P.J.A.D.
Plaintiffs, Kenneth Van Dunk and his wife Deborah suing per quod, appeal from an order of the Law Division entered *458 on February 20, 2009, which granted summary judgment to defendant James Construction Company ("James") and dismissed their complaint. Plaintiff[1] sustained serious injuries as a result of a trench collapse at his worksite. Plaintiffs claim that the workers' compensation bar does not apply to preclude their suit because the federal Occupational Safety and Health Administration ("OSHA") found that the accident was the result of a "willful violation" of its regulations, and therefore constituted an "intentional wrong" for State law purposes, and because James' superintendent sent plaintiff into the eighteen to twenty foot trench knowing the dangers he faced. Plaintiffs argue that "the court erred in holding that an intentional wrong under N.J.S.A. 34:15-8 had not occurred." We reverse and remand for further proceedings.

I
Plaintiff sustained multiple injuries on August 10, 2004, as the result of a trench collapse on a construction project at Giralda Farms (the "project") in Chatham and Madison. In their complaint, plaintiffs identified defendants Reckson Associates and Reckson Construction as "related business organizations" that developed and managed the project. The complaint also alleged that Reckson Construction had contracted with James, an excavation contractor, to construct a retention pond and other related structures.
For purposes of this appeal, we must accept the facts in a manner giving all legitimate inferences to plaintiffs on James's motion for summary judgment. Estate of Hanges v. Metropolitan Prop. & Cas. Ins. Co., 202 N.J. 369, 388, 997 A.2d 954 (2010); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Plaintiff was employed as a laborer by James which had to complete its "work for the retention pond and storm water upgrades before other work [on the project] could go forward." Therefore, its contract with Reckson had a "substantial completion" date of October 15, 2004. The contract also provided that James would be responsible "for planning the work to meet the schedule required by Reckson." James was also responsible for ensuring that the work was executed safely.
Glenn Key ("Key") was James' superintendent for the project and a "competent person" for purposes of OSHA. An OSHA "competent person" is
[o]ne who has had training in and is knowledgeable about soil analysis, the use of protective systems, and the requirements of the OSHA standard. One who is also capable of identifying existing and predictable hazards in the surroundings or working conditions which are hazardous, unsanitary or dangerous to employees, and has the authority to take prompt corrective measures to eliminate them.
Key had received formal OSHA safety training through the Utility and Transportation Contractors Association ("UTCA") and been employed by James for thirty-two years as a construction superintendent. He had been "fully trained in the requirements of OSHA with respect to excavation work" and has undergone forty hours of OSHA training "since the accident."
From the outset of the project, James had experienced difficulties because of "record rainfalls" and "torrential rain" which impeded the progress of the project. *459 On August 10, 2004, the day of the accident, a dewatering sump[2] for the retention pond under construction was being relocated. The assignment involved "mov[ing] the existing dewatering sump that was in the bottom of the pond to a location just outside of the top slope of the pond." According to J.D. Potash ("Potash"), James' president, the sump had to be relocated that day before it rained because the rest of the project "could not advance" if the sump was not relocated.
The assignment to relocate the sump involved plaintiff, Key and five other individuals. In order to relocate the sump, there had to be an excavation and construction of a trench. According to Potash, the trench was
to be lined with ... geo-textile fabric... which is a black kind of wool or felt-like fabric and usually in the bottom goes a layer of stone, maybe four, six inches deep of stone, then a pipe is laid, and then more stone is put around the sides and above the pipe and then the fabric is then folded over like an envelope so you have kind of a sandwich with the fabric being the bread and the pipe being the meat and the stone being the condiments....
Initially, Key attempted the cover the trench, which was about eighteen to twenty feet deep, by having his men "stretch out [the fabric] and walk it over the trench." However, the crew experienced some difficulty while attempting to do this. According to Key, the fabric "wasn't laying right against the trench. It was getting twisted."
At this point plaintiff "volunteered" to go into the trench and "fix" the fabric. However, Key "stopped him" and told him not to enter the trench. According to Key, he was concerned about plaintiff's safety "[i]n case of failure." Key acknowledged that "[c]onsidering the depth of the excavation, the soil type and the conditions and the lack of room to cut the slopes back more, ... [he] didn't want personnel to enter the excavation to install the filter fabric" because he was worried about the trench "failing."
After denying plaintiff's offer to enter the trench, the crew, consisting of six men, continued to "drape the filter cloth" over the trench. Key indicated that he saw "some cracking in the bank" of the trench as they tried to lay the cloth. However, they were unsuccessful in laying it properly. Key maintains that in his "frustration" to get the fabric to lay correctly, he ultimately "directed" plaintiff "to enter the excavation to correct the problem with the cloth." That direction was in violation of OSHA's non-discretionary requirements because the trench had no protective system to make it more stable.[3]
According to Key, there was a "trench box" which could have been used to make the trench more stable but he did not use it because the "[b]ucket and backhoe" were wider than the box and "wouldn't fit inside" the trench. Additionally, Key maintains that he did not use "sloping," *460 which would have also made the trench more stable, because it was "a confined area" and "the space" for the trench would not allow it. In less than five minutes after plaintiff entered the trench, it caved in and buried plaintiff to his chest. He was transported to the Morristown Memorial Hospital and treated for multiple injuries.
Thereafter, work on the project was suspended temporarily pending an OSHA investigation. After its investigation, OSHA issued James a citation for a "willful" violation of its regulations based on the fact that it had failed "to protect [its employees] from cave-ins by an adequate protective system," the excavation was not properly "sloped" and because plaintiff "went into an unprotected trench, approximately [twenty] feet in depth...." It was fined in the amount of $49,000.
In Key's written report following the accident, he stated that "[c]onsidering the depth of the excavation, the soil type and conditions and the lack of room to cut the slopes back more[,] ... [he] didn't want personnel to enter the excavation to install the filter fabric...."

II
Plaintiffs argue that the trial court erred in holding that an "intentional wrong" had not occurred for purposes of N.J.S.A. 34:15-8. According to plaintiffs, James does not have immunity under the workers' compensation statute because the facts, when viewed in the totality of the circumstances, create a jury question on that issue. On the other hand, James responds that Key's actions do not amount to an "intentional wrong" because they do not meet the threshold established by caselaw.
The Workers' Compensation system was characterized by the Supreme Court in Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 174, 501 A.2d 505 (1985) (discussing the legislative history of the Workers' Compensation Act) as "a historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accidents" as a result of and through the "course of employment." Thus, "employees would receive assurance of relatively swift and certain compensation payments, but would relinquish their rights to pursue a potentially larger recovery in a common-law action." Ibid. However, as the Court subsequently noted in Laidlow v. Hariton Mach. Co., Inc., 170 N.J. 602, 605, 790 A.2d 884 (2002), Millison's "characterization" of the Worker's Compensation system is "only broadly accurate" because not every accident is immune from a common law suit. This is because there are "certain types of conduct by the employer and the employee" which the Legislature has determined "will render the Workers' Compensation bargain a nullity." Id. at 605-06, 790 A.2d 884.[4]See N.J.S.A. 34:15-7; Akef v. BASF Corp., 140 N.J. 408, 412-13, 658 A.2d 1252 (1995). Moreover, N.J.S.A. 34:15-8 limits an employer's immunity to common law suits by excepting "intentional wrong[s]." Laidlow, supra, 170 N.J. at 606, 790 A.2d 884.
The issue of what qualifies as an "intentional wrong" under the statute was first addressed by our Supreme Court in Millison, supra, 101 N.J. at 177-80, 501 A.2d 505. There, the Court stated that *461 the "intentional wrong" exception was to be interpreted narrowly so as not to "swallow up" the "`exclusivity' provision of the Act" and adopted Dean Prosser's "substantial certainty" test. Id. at 177-78, 501 A.2d 505. "Intent" under the "substantial certainty" test is defined as follows:
[T]he mere knowledge and appreciation of a risksomething short of substantial certaintyis not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.
[Id. at 177, 501 A.2d 505 (quoting W. Prosser and W. Keeton, The Law of Torts § 80 at 36 (5th ed. 1984)).]
The Millision Court stated that "the dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other ... [had to] be drawn with caution, so that the statutory framework of the Act [wa]s not circumvented simply because a known risk later blossom[ed] into reality." Millison, supra, 101 N.J. at 178, 501 A.2d 505. Hence, in order to meet the standard, the Court further stated that "[w]e must demand a virtual certainty." Ibid. For that matter, gross negligence by an employer or a lack of concern for an employee's safety is insufficient to remove the cloak of immunity. Tomeo v. Thomas Whitesell Constr. Co., Inc., 176 N.J. 366, 823 A.2d 769 (2003) (defendant entitled to summary judgment and jury verdict vacated where employer disabled safety lever on a snow blower because "the Legislature contemplated that those accidents would be part and parcel of workplace hazards covered by" the Act). Furthermore, the mere toleration of workplace hazards is insufficient to show an "intentional wrong." Millison, supra, 101 N.J. at 179, 501 A.2d 505.
The Court therefore adopted a two-prong test that had to be satisfied in order to establish that an employer has lost its immunity under the statute: "(1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize." Laidlow, supra, 170 N.J. at 617, 790 A.2d 884. The first prong of the test is known as the "conduct" prong, and the second as the "context" prong.
In Laidlow, the Court refined the two-prong test, and indicated that in determining whether the employer's actions would meet the conduct prong no one fact was dispositive. Laidlow, supra, 170 N.J. at 621, 790 A.2d 884. Accordingly, there had to be an analysis based on the totality of the circumstances. Id. at 621-23, 790 A.2d 884. See Mull v. Zeta Consumer Products, 176 N.J. 385, 823 A.2d 782 (2003). For instance, the Court noted that the "absence of a prior accident" or "close-calls" does not necessarily "mean that the employer did not appreciate that its conduct was `substantially certain' to cause death or injury." Laidlow, supra, 170 N.J. at 621, 790 A.2d 884. Furthermore, the Court stated that the removal or alteration of a safety device, although not an "intentional wrong" per se, could meet the conduct prong depending on the facts of the case. Id. at 617-18, 790 A.2d 884. The Court also found that "[i]n general, the same facts and circumstances will be relevant to both prongs of Millison." Id. at 623, 790 A.2d 884.
*462 Moreover, the Court articulated how summary judgment motions based on the Workers' Compensation bar should be approached. Laidlow, supra, 170 N.J. at 623, 790 A.2d 884. First, the court had to determine "whether, when viewed in a light most favorable to the employee, the evidence could lead a jury to conclude that the employer acted with knowledge that it was substantially certain that a worker" would sustain injury. Ibid. In the event that question is answered in the affirmative, "the trial court must then determine whether, if the employee's allegations are proved, they constitute a simple fact of industrial life or are outside of the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar." Ibid. If the latter, a trial is required when "the substantial certainty standard presents a jury question," because whether the employer's actions meet the context prong is a judicial function. Ibid. However, resolving whether the conduct prong has been met is a question which the jury has to determine. Ibid.
Plaintiffs argue that the motion judge erred in finding that Key's conduct did not present a jury question under the conduct prong. We agree.
In Laidlow, supra, 170 N.J. at 606, 790 A.2d 884, the Court was again called upon to determine whether an employer's conduct constituted an "intentional wrong" under N.J.S.A. 34:15-8. In that case, Rudolph Laidlow ("Laidlow") had "sustained a crush and degloving injury" which resulted "in partial amputations of the index, middle, ring and small fingers." Id. at 606-07, 790 A.2d 884. He suffered these injuries when his hand became caught in a rolling mill he was operating at his place of employment, AMI-DDC, Inc. ("AMI"). Id. at 606, 790 A.2d 884. There had been a prior occasion where Laidlow's glove had "become hooked on a bar, but he was able to slip his hand out of the glove before it was pulled into the machine." Id. at 607, 790 A.2d 884. Another co-worker's gloves had previously been hooked on the bar, as well. These incidents were reported to AMI. The employees' gloves were getting hooked because, although the safety guard on the rolling mill had been installed, it was "`never' engaged." Id. at 608, 790 A.2d 884. The only time the guard was placed in the proper position was when OSHA inspectors came to the plant. As soon as the OSHA inspectors left, the guard was "disabled." Ibid. Laidlow operated the mill without the safety guard for about twelve to thirteen years. The plaintiff had expressed concern about operating the mill without the safety guard to his supervisor on several occasions. Ibid.
After his injury, Laidlow brought a common law action against AMI. Laidlow argued that "the combination of the employer's disabling of the safety guard and [its] deception of OSHA present[ed] a triable issue on whether" AMI's conduct constituted an "intentional wrong." Id. at 609-10, 790 A.2d 884. On the other hand, AMI argued that removal of a safety device alone failed to meet the "intentional wrong" test. Id. at 610, 790 A.2d 884. Additionally, AMI maintained that operating the mill without any injury within the past twelve or thirteen years indicated that the conduct did not amount to an "intentional wrong." Ibid.
The Court found that under the totality of the circumstances, a reasonable jury could conclude that the employer knew that it was "substantially certain" that removal of the safety device would result in injury. Id. at 622, 790 A.2d 884. In making that determination, the Court considered "the prior close-calls, the seriousness of any potential injury that could occur, Laidlow's complaints about the absent *463 guard, and the guilty knowledge of AMI as revealed by its deliberate and systematic deception of OSHA." Ibid.
The Court was again faced with the issue of when an employer's conduct exposes it to common law liability in Crippen v. Central Jersey Concrete Pipe Co., 176 N.J. 397, 823 A.2d 789 (2003), where Harold Crippen ("Crippen"), a "material man" of the defendant, Central Jersey Concrete Pipe Company, died in the course of his employment. Id. at 399-400, 823 A.2d 789. As a "material man" Crippen "controlled the movement of sand and gravel into loading hoppers located in the... change-over room." Id. at 399, 823 A.2d 789. In order to regulate the inflow of sand and gravel, "Crippen had to walk on a single two-inch by ten-inch wooden plank and stand on a six-foot high, unsecured ladder that rested on the wooden plank." "[W]hile performing those duties Crippen fell into the sand hopper and suffocated" to death. Id. at 400, 823 A.2d 789. Prior to Crippen's death, OSHA had conducted an investigation and cited the defendant for several violations. Id. at 401-02, 823 A.2d 789. During discovery, the plaintiff found out that the defendant had failed to "abate many of the hazardous conditions" for which it had been cited. Id. at 403, 823 A.2d 789. Additionally, the defendant's Environmental Health and Safety Manager acknowledged that he knew someone "could die" if the violations were not abated. Ibid.
The specific issue before the Court was "whether an employer's ... fail[ure] to cure hazardous conditions in violation of a directive issued by ... OSHA, coupled with its intentional deception of OSHA," amounted to an "intentional wrong" under N.J.S.A. 34:15-8. Id. at 399, 823 A.2d 789. Among other things, the defendant argued that its actions did not amount to an "intentional wrong" because there had been "no prior incidents involving the hopper" and its failure to implement OSHA's safety programs was a "mere toleration of a dangerous condition." Id. at 405-06, 823 A.2d 789.
The Court analyzed the facts under the conduct and context prongs articulated in Millison and reiterated "that the absence of a prior accident [does] not preclude a finding of an intentional wrong." Id. at 408, 823 A.2d 789 (citing Laidlow, supra, 170 N.J. at 621, 790 A.2d 884). The Court stated that such evidence, and violations of OSHA safety regulations were valuable in the "substantial certainty" analysis. Id. at 408, 823 A.2d 789. Thus, the Court "conclude[d] that a reasonable jury could conclude that defendant had knowledge that its deliberate failure to cure the OSHA violations would result in a substantial certainty of injury or death to one of its employees." Id. at 409, 823 A.2d 789.
Finally, in Mull, supra, 176 N.J. at 387, 823 A.2d 782, the plaintiff was employed as a line operator at the defendant's plastic-bag manufacturing facility. As part of the plaintiff's duties she worked with a machine known as a "winder," which wound "plastic bags onto spools for packaging and delivery." Ibid. The plastic frequently jammed the machine and caused the nylon ropes to break requiring the line operator to clear the jam and replace the broken ropes. Ibid. On the day of the accident, the machine became jammed while the plaintiff was operating it. The plaintiff stopped the machine, "lifted a fiberglass guard, removed the lodged plastic, and began to replace the nylon ropes" which had broken. Id. at 387-88, 823 A.2d 782. While doing that, "the winder began to operate, pulling [the] plaintiff's left hand into the machine." Id. at 388, 823 A.2d 782. The plaintiff suffered "serious injuries, including the amputation of her left pinky and ring fingers." Ibid. OSHA cited *464 the defendant for several safety violations as a result of the accident. Ibid. The defendant had also been previously cited "for failing to provide its employees with... lockout/tagout procedures" "designed to control the release of hazardous energy when a worker is servicing or performing maintenance on equipment or machinery." Ibid. There had also been a prior accident with another line operator who had been injured when his hand was pulled into the winder. Ibid.
The Supreme Court emphasized that in determining whether there was a "substantial certainty" of death or injury, "no one fact" was dispositive because the facts would be viewed in the totality of the circumstances. Id. at 392, 823 A.2d 782. Rejecting the defendant's argument that it had not deceived OSHA, the Court found that under the facts, the plaintiff had satisfied Millison's conduct prong, ibid., and because the plaintiff had also satisfied the "context prong," id. at 392-93, 823 A.2d 782, the order of summary judgment was reversed. Id. at 393, 823 A.2d 782.
In his deposition, Key acknowledged that "[c]onsidering the depth of the excavation, the soil type and the conditions and the lack of room to cut the slopes back more, ... [he] didn't want personnel to enter the excavation to install the filter fabric" because he was worried about the trench "failing." Additionally, Key indicated that he had said "no" to plaintiff's initial request to enter the trench because he was worried about his safety. Therefore, defendant had knowledge that allowing its employees to enter the trench without any safety device could lead to injury or death. Moreover, Key's acknowledgement that there was an accumulation of water in the bottom of the trench, indicating that moisture was weeping from the soil, that there was cracking on the bank of the trench, coupled with his knowledge that Type C soil, the kind of soil he was working with, was the least stable, all show, in the totality of the circumstances, that he knew the trench was unstable and that it could fail.
Moreover, like the plaintiffs in Laidlow, Crippen and Mull, Van Dunk's safety was disregarded to increase defendant's profit and productivity. Potash acknowledged that the relocation of the sump was essential because without it the rest of the project could not go forward. Therefore, defendant was under pressure to relocate the sump before it rained. The fact that plaintiff's safety was sacrificed for defendant's benefit is reinforced by the events following his accident. After OSHA had finished its investigation, defendant was able to relocate the sump by using the trench box it had on site without harm to any of its employees.
We recognize that this is a "close case." There was no removal of a safety device, although non-use of the "trench box" is somewhat analogous. Similarly, there was no deception for purposes of an OSHA inspection or otherwise, and no prior or on-going events involving similar risks. In fact, Key had gone out of his way to prevent a prior entry into the trench because he understood the risks, but perhaps that made his ultimate decision more "knowing" and "willful" than others involved in the precedent, and certainly one which could be viewed by a reasonable jury as involving a "substantial certainty" of death or injury. Furthermore, the fact OSHA gave defendant a "willful" violation citation for failing to protect Van Dunk from a cave-in by using either a trench box or sloping informs the "totality of the facts" and circumstances analysis under the conduct prong. Laidlow, supra, 170 N.J. at 623, 790 A.2d 884. See also Alloway v. Bradlees, Inc., 157 N.J. 221, 236, 723 A.2d 960 (1999) (suit by employee of *465 subcontractor against general contractor and others).
Nonetheless, defendant maintains that the court in Fisher v. Sears, Roebuck & Co., 363 N.J.Super. 457, 470, 833 A.2d 650 (App.Div.2003), cert. denied, 179 N.J. 310, 845 A.2d 135 (2004) expressed a reluctance to find an "intentional wrong" in cases falling outside of the industrial-manufacturing context. We disagree. While the court's language distinguished some precedent outside that setting, the Fisher Court merely concluded that Sears's conduct was not egregious enough to support a finding of "intentional wrong." Id. at 472-73, 833 A.2d 650.
We need not address plaintiff's contention that OSHA's "willful" violation and "intentional wrong" under the statute "share common elements," and that the OSHA finding is dispositive of the issue before us. While it may be important in the totality of the circumstances analysis, Laidlow, supra, 170 N.J. at 623, 790 A.2d 884, we do not find it conclusive.[5]See also Alloway v. Bradlees, Inc., supra, at 236, 723 A.2d 960.
Finally, plaintiffs maintain that the court below erred in holding that Van Dunk's accident "was a fact of industrial life." As already noted, with respect to the context prong of the Millison test, the Court in Laidlow stated that "[i]n general, the same facts and circumstances will be relevant to both prongs." Laidlow, supra, 170 N.J. at 623, 790 A.2d 884. In making its conclusion about the context prong, the trial court here stated that "[g]iven the hazardous nature of construction sites, this Court finds that this is just a function of industrial life." The trial court did not give significant credit to the OSHA citation or the fact that defendant could have made the trench more stable if it had used protective devices.
Although the motion judge is accurate in stating that construction sites have a dangerous nature, that does not excuse the failure to use safety devices to alleviate the dangers and risks which were clearly known in this case. Here, it is unlikely that the Legislature would have considered allowing an employee to enter an unstable trench without the use of a trench box or adequate sloping, coupled with the employer's knowledge that the trench was unstable and could fail at any moment, to "constitute simple facts of industrial life." Laidlow, supra, 170 N.J. at 622, 790 A.2d 884. Thus, on the legal issue before us, we conclude that the Legislature would not have sanctioned the context within which this accident happened, or barred its recovery from James. Thus, plaintiff satisfied his burden on both prongs, warranting a reversal of the summary judgment.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] When we refer to plaintiff in the singular, we refer to Kenneth who is sometimes called Van Dunk. The matter has been dismissed or settled as to the other defendants.
[2] A sump is "a way to control ground water through pumping." A sump was "necessary to keep the ground water and the rain water out of the pond" while construction was ongoing.
[3] Pursuant to OSHA regulations, "[e]ach employee in an excavation shall be protected from cave-ins by an adequate protective system designed in accordance with" the regulations. However, protective systems are not required when: "(i) [e]xcavations are made entirely in stable rock; or (ii) [e]xcavations are less than [five] feet (1.52m) in depth and examination ... by a competent person provides no indication of a potential cave-in." Occupational Safety and Health Administration Rule, 29 C.F.R. § 1926.652(a) (2010).
[4] Certain "intentional" misconduct by the employee may also preclude benefits. N.J.S.A. 34:15-7.
[5] In Millison v. E.I. du Pont de Nemours & Co., 226 N.J.Super. 572, 593-95, 545 A.2d 213, aff'd, 115 N.J. 252, 558 A.2d 461 (1989), we found that OSHA citations were hearsay because they were "opinions of investigators and ordinarily d[id] not `carry with [them] the indicia of reliability that is inherent in government adopted safety standards.'" Ibid. (quoting Dixon v. Int'l Harvester Co., 754 F.2d 573, 581 n. 5 (5th Cir.1985)). Plaintiff argues that the court's conclusion does not apply here because "in Millison the employer contested the OSHA citations and obtained a stipulation that the consent agreement would not be evidential," but that limitation is not present here because neither Potash nor Key refuted any portion of the citation. In light of our disposition, we need not consider that issue or others raised by plaintiffs.